Patsy O. TIFFANY, Administratrix, and Personal Representative of the Estate of Henry H. Tiffany, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant and Third–Party Plaintiff,

v.

BRANDON LADD CORPORATION, Third–Party Defendant.

(In Re AIR CRASH OFF CHERRY POINT, NORTH CAROLINA, JANUARY 9, 1983).

Civ. A. Nos. 84–0100–C, 85–0004–C, 85–0040–C, 85–0048–C and 85–0052–C.

United States District Court, W.D. Virginia, Charlottesville Division.

Nov. 27, 1989.

Frank A. Mika, Waynesboro, Va., Michael J. Pangia, Gilman, Olson & Pangia, Washington, D.C., for Patsy Tiffany.

John J. Tigert VI, Kathryn A. Ledig, Nicholas H. Cobbs, Tigert & Roberts, Washington, D.C., for Brandon Ladd.

E. Montgomery Tucker, Asst. U.S. Atty., Roanoke, Va., Thomas B. Almy, Torts Branch, Civ. Div., Dept. of Justice, Washington, D.C., for U.S.

Frederic A. Swartz, Swartz & Swartz, Boston, Mass., for Sean and Elizabeth O'Mahony.

J. Page Williams, Charlottesville, Va., pro se.

Nicholas H. Cobbs, Washington, D.C., Gregory N. Harney, Petree, Stockton, Robinson, Vaughn, Glaze & Maready, Winston–Salem, N.C., for Brandon Ladd and Patsy O. Tiffany.

Gerard R. Lear, Washington, D.C., William H. Hollows, New Bern, N.C., for Sally Furniss Witaker.

## MEMORANDUM OPINION

MICHAEL, District Judge.

This matter arises out of a mid-air collision off the coast of North Carolina at approximately 16:44:46 EST on January 9, 1983, between a civilian aircraft, a Beechcraft Baron BE 55, and an F4–C phantom interceptor. The cause of action arises under the Death on the High Seas Act (DOHSA), 46 U.S.C.App. § 761 et seq. Plaintiff has brought the action on behalf of the estate of the deceased, Henry Tiffany, pilot of the Baron, and is seeking damages for pecuniary loss only, pursuant to 46 U.S.C. App. § 762. *Offshores Logistics v. Tallentire,* 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986). Defendant United States has counterclaimed for $209,895 against third-party defendant Brandon Ladd Corporation, the lessee of the Baron Aircraft, for damage to the F4–C. Brandon Ladd seeks $45,000 from the United States for loss of the Baron.

After presentation of the evidence to this court, the respective parties have moved for judgment in their favor. Having carefully considered the evidence, this court, sitting as the sole trier of fact, finds that defendant United States bears the liability for the collision and, as such, grants plaintiff's motion for judgment and awards plaintiff damages in the amount of $1,394,342.00. Since this court finds the actions of the United States constitute the proximate cause of this accident, the court denies the United States' motion for judgment against Brandon Ladd Corporation and finds that Brandon Ladd is entitled to recover $45,000 as a consequence of the loss of its Baron Aircraft.

### I.

At the time of his death, decedent Henry Tiffany was an experienced pilot with approximately 4,455 flying hours. He was fully certificated and sufficiently experienced to make the flight in question. Decedent possessed an instrument rating which meant that he was qualified to fly in instrument meteorological conditions. At approximately 13:00 EST, January 9, 1983, decedent submitted a flight plan at the Nassau, Bahamas, Airport which called for a flight to Norfolk, Virginia, via Wilmington, North Carolina. Pilots are required to enter flight plans when the intended flight would take the craft through the Air Defense Identification Zone (ADIZ). 14 C.F.R. § 99. Decedent's attention was directed by the flight service station supervisor to a Notice to Airmen (NOTAM) advising pilots entering the United States from the Caribbean that they should clear customs at certain designated Florida airports. Apparently because of the NOTAM, decedent refiled a flight plan listing Fort Pierce, Florida, as his initial touchdown point.

After leaving Nassau, decedent did not follow the accepted practice of "activating" his flight plan by contacting the flight service station. If not activated within an hour after takeoff, filed flight plans are

considered void and decedent's revised flight plan which had been filed with the Nassau flight service station was then marked "DNA" [Did Not Activate]. Communications with the Bahamas being uncertain, it is possible that decedent attempted to modify his flight plan after takeoff. The court can only find that the plan was in fact not activated, but the court also declines to read into this apparent omission any intent on the part of decedent to deceive NORAD (North American Aerospace Defense Command) regarding the point of decedent's penetration of the ADIZ.[1]

Rather than flying to Fort Pierce, Florida, decedent instead headed north, as would have been called for by his initial flight plan. At approximately 16:07:40, radar trackers at the NORAD control headquarters at Fort Lee, Virginia, ("FERTILE Control") detected an unidentified aircraft flying north toward the North Carolina coast. Since FERTILE Control had no flight plan correlating to that radar track, the aircraft was declared unknown. A responsibility of NORAD is to track and identify aircraft penetrating the ADIZ. If a radar target correlates with a filed flight plan, then the target is declared friendly and it receives no additional NORAD attention. If the target is classified as an unknown, it can be declared as a friendly in one of two ways: either by obtaining positional information from Air Traffic Control (ATC) centers which will correlate with the unidentified target or by identification pursuant to an interception.[2]

Pursuant to the designation of the Baron aircraft as an unknown track, two F–4 phantoms were scrambled from Seymour Johnson Air Force Base in Goldsboro, North Carolina, to make an official identification of the Baron. After the scramble, decedent attempted to contact the ATC facility in Leesburg, Virginia (ARTCC) at 16:30:32. Apparently, he received no immediate response but ARTCC did acknowledge the call at 16:31:26, referring to decedent's aircraft call sign "7142N." In this exchange, decedent told ARTCC that he estimated his position to be approximately 50 miles south of New Bern, North Carolina, an incorrect estimate, and his altitude to be 9500 feet. Decedent requested radar assistance to help him avoid some weather cells and informed ARTCC that he was "squawking 1200," i.e., that the Baron's transponder was emitting a nonspecific squawk which denotes visual flight rules.[3] At 16:37:04, decedent communicated to ARTCC that he had recalculated his position to be 56 miles from the Wilmington VOR, a groundbased navigational transmitter. In his communication, decedent also identified for ARTCC the make and model of his aircraft.

By 16:37:42, ARTCC had passed to FERTILE Control information about the Baron's position, call sign, altitude, and aircraft type. While this information was sufficient under NORAD regulations to justify reclassifying the Baron as friendly, the ATC officers sought to confirm this information. The initial pass for a visual identification by the F–4s was cancelled by FERTILE Control because they were "coming in too hot," that is, their angle of approach was too sharp for an effective identification. The only information passed to the F–4s was that their target was "at approximately 9000 feet." Since the F–4s communicated on military frequencies and the Baron on civilian frequencies, the aircraft could not speak directly to each other. Thus, data emanating from either the F–4s or the Baron had to be relayed to ARTCC and FERTILE Control and only after that thence to the other protagonist. The court

---

**1.** Nor do the vagaries of decedent's eventual flight plan or his initial, incorrect estimate of his position off Wilmington, North Carolina, discussed *infra,* suggest to this court any intent on decedent's part to evade detection. The claim of the United States to the contrary is effectively rebutted by decedent's request to have the appropriate personnel ready so that he might clear customs when landing in Norfolk.

**2.** Alternatively, an aircraft with a true air speed of less than 180 knots can be classified as friendly. The record shows that decedent's true air speed at this time was in excess of 180 knots.

**3.** The transponder enhances the aircraft's presence on a radar screen and transmits additional information which assists in identifying the aircraft.

also finds that the F-4s were not given a local altimeter setting when the aircraft descended below 18,000 feet so that their altimeters could be recalibrated for an accurate altimeter reading. Thus, during the entire intercept procedure, the altimeter of the F-4 involved in this collision, JL-26, failed accurately to reflect its true altitude.

After repositioning, the F-4 which eventually collided with the Baron obtained the Baron on its radar at 16:41:18 and at 16:41:54 "called a Judy" (indicating that this aircraft, JL-26, was taking control of the intercept and was using its on-board radar to complete the identification). At virtually the same time, 16:41:55, ARTCC requested that the Baron perform an "IDENT," a procedure which causes the transponder to emit a specific identification signal. Following this "IDENT," ARTCC advised FERTILE Control at 16:42:20 that "We just had this ... Four Two November IDENT and that is him down there at Juliet Lima's [the F-4C] twelve o'clock and ... 6, 7 miles." The ARTCC transcript shows that FERTILE Control responded with a "Roger," although the FERTILE Control transcript omits part of the message. However this court discounts the contention of the government that parts of the transmission were "stepped on" and that the entire transmission was not intelligible to FERTILE Control, since FERTILE responded with a "Roger," indicating that a message understood as complete was received and comprehended.[4]

This court finds that information sufficient to identify the Baron was available by 16:37:42. However, even if the package of data was believed in good faith to be incomplete at that time, it is abundantly clear that data which would have justified aborting the intercept was passed from ARTCC to FERTILE Control at 16:42:20. However the confirmed identification received at 16:42:20 was not passed to the identifica-

tion section at FERTILE Control until 16:43:57. The FERTILE Control Officer in overall control, the senior director, did not order the intercept terminated until 16:44:21 and this order was not passed to JL-26 until 16:44:42, only 2 seconds before the collision. In addition, the printout of the Semi Active Ground Environment (SAGE) system of FERTILE Control indicates that the status of the Baron was changed to friendly at 16:43:42.

After the JL-26 obtained the Baron on radar and "called a Judy," it proceeded to close on the Baron. Ostensibly, the mission of the F4-C was to identify the aircraft visually, but JL-26 reported that it was flying "Popeye" (under conditions of restricted visibility). This observation does not mandate a finding that the decedent was either in error or deceitful when he earlier reported good visibility by squawking 1200, for decedent did request assistance at that time in avoiding weather cells and, quite obviously, the meteorological conditions are capable of rapid change. Both the pilot and the weapons systems office (WSO) in charge of radar in JL-26, believed that the Baron was above and to the right of their F4-C. The pilot and WSO were under different impressions about the amount of vertical separation between their craft and the Baron. The pilot was operating under the assumption that there was 500 feet of vertical separation, while the WSO believed there was 1,000 feet of vertical separation. However, because the F4-Cs had not been given the new altimeter setting, JL-26 was actually 180 feet closer to the Baron vertically than either the pilot or WSO believed.

JL-26 closed on the Baron with an overtake speed of 127 knots at the time of the collision. As JL-26 closed on the Baron, the radar system of the F4-C displayed a "Break X" configuration, the symbol that

---

4. While the court finds that the response of "Roger" is sufficient to indicate that the entire message was received, it would have been preferable for the trier of fact to have had access to the tapes or, at the least, to a full and accurate transcript of the tapes which would be beyond contention between the parties. A transcript of the ARTCC tapes was available but, according to the government, it was not possible to furnish a rerecording of the original FERTILE tapes because no machine is now available for playback. Initially, the government was able to make a transcript from the tapes for the accident report. However, the court is concerned that the FERTILE tapes are now, allegedly, quite inaccessible.

the F4–C had approached so close to the target that the missiles of the F4–C could not be utilized. After the Break X display, and the receipt from FERTILE Control of the identification of the Baron, JL–26 applied full throttle without afterburners and initiated a left turn. The collision immediately ensued, the left wing of the F4–C slicing through the right side of the Baron aircraft. The National Transportation and Safety Board (NTSB) Collision Reconstruction Report concluded that there was a 4 degree difference between the bank angle of the Baron and that of the F4–C. This conclusion is based on the NTSB assumption that JL–26 was in a 30 degree left bank, an assumption based on the recollection of the pilot of the F4–C. The government contends that the Baron turned left into the path of JL–26, crossing the intended path of JL–26 so that the right side of the Baron was to the left of the JL–26, but the United States has not been able to prove that the Baron had initiated such a turn and, more importantly, the radar data does not positively indicate any such turn. The collision resulted in the death of the pilot and all passengers aboard the Baron. The F4–C, although sustaining considerable damage to its wing, was able to return to its base.

## II.

■ The proximate cause of the collision was negligence by the crew of JL–26 and the FERTILE Control personnel. While decedent's decision to fly back to the United States from Nassau and the particular flight path which he chose to pursue obviously set into motion the series of events which resulted in the collision, those actions were sufficiently remote and set the stage for the superceding acts of negligence by defendant United States.

The government has argued that decedent set in motion a chain of events which should have been foreseeable to, and anticipated by, the decedent, and claims that this foreseen chain of events must include the collision itself. For example, the United States argues, decedent should have foreseen that penetrating the ADIZ while flying over 180 knots and without having filed

an activated flight plan would result in an attempted intercept. This may well be true, but it does not serve to protect the government from liability, for while decedent should perhaps have anticipated that an intercept would be attempted against an unidentified penetration of the ADIZ, he should not have been expected to have foreseen the inappropriate actions of FERTILE Control and of the F4–C crew. The initial classification of the Baron as unidentified was foreseeable, but not the eventual collision. Decedent himself attempted to relay sufficient information to ARTCC (and, presumably, thence to FERTILE Control and the intercepting aircraft) to have the intercept aborted. Decedent's actions, some of which were concededly less than optimally prudent, may be background conditions of the eventual collision, but they do not constitute the proximate cause. *United States v. De Vane*, 306 F.2d 182, 187 (5th Cir.1962).

FERTILE Control had sufficient information, within ample time, to have terminated the intercept. Ground control failed to give to the F4–C pilot the prompting and information necessary for him to reset his altimeter. Finally, the F4–C continued a mission designed for a visual identification in weather effectively precluding such an identification, misidentified the position of the Baron aircraft relative to its position, turned left and ascended when the procedures called for a descent and a right turn, and failed to maintain the proper amount of vertical separation. Therefore, the conditions which decedent created cannot be considered to be the proximate cause of the collision because of superseding negligence of FERTILE Control and the F4–C crew. That superceding negligence severed any putative causal connection between decedent's actions and the collision. *Moorehead v. Mitsubishi Aircraft Internat'l Inc.*, 639 F.Supp. 385, 391 (E.D.Tex.1986).

In its efforts to discern the causal chain, this court found the testimony of one of the government's own witnesses, Lt. Col. Smith, to be particularly relevant and helpful. This witness, an Air Force officer with a great deal of interceptor experience

as a participant, supervisor, and instructor, testified eloquently to the responsibility which the interceptor crew bears for the conduct of the intercept. Col. Smith stated that an intercept pilot must be prepared to meet *any* action an intercepted aircraft might take. By all his testimony, it is clear that it is part of the mission of the interceptor to anticipate any possible sudden maneuvers by the overtaken aircraft. An intercepting pilot cannot assume that the overtaken craft will keep to the same course and heading or take any given maneuver. This is why a safe vertical separation and a limited overtake speed are benchmarks of the prudent intercept. The very purpose of an intercept is to identify a target not meeting the criteria necessary to classify an aircraft as friendly. Even if one does not impute a necessarily hostile intent to the unidentified target aircraft, one must assume its intent is unknown. Therefore, both the FERTILE ground support personnel and the crew of any intercepting aircraft must be prepared to expect a range of possible action by the unidentified aircraft.

The finding by this court that the collision was proximately caused by negligence on the part of defendant United States renders moot any question of the liability of defendant Brandon Ladd Corporation for the damage done to the wing of the F4–C.

### III.

The amount of loss to Brandon Ladd Corporation from the destruction of the Baron aircraft has been stipulated by Brandon Ladd and the United States as $45,000. Since the court has found the United States to be liable for the collision, Brandon Ladd is entitled to recover the damages ensuing from the loss of the Baron.

■ Plaintiff is entitled under DOHSA to recover on her pecuniary loss only. 46 U.S.C.App. § 762. Plaintiff offered evidence relating to pecuniary loss stemming from the end of decedent's law practice and from the diminution of decedent's net worth. Decedent spent approximately half of his working time on real estate development and plaintiff seeks damages from the diminution of decedent's net worth which flows from real estate development.

This court declines to grant plaintiff damages on the loss of net worth which is alleged to have resulted from decedent's death. The damages represented by plaintiff's claim about net worth refer not just to an income stream, but to an accumulation and the growth of that accumulation. This growth is assuredly not dependent solely on the continued existence of decedent, as would be the income stream from a specialized occupation like the practice of law. Upon decedent's death, his net worth did not suddenly evaporate. This court cannot award damages on the basis of what real estate projects decedent might have developed and how profitable those conjectural projects might or might not have been. Furthermore, plaintiff cannot use as evidence of what would have been an increase in decedent's net worth (had he lived), the fact that plaintiff disposed of a number of decedent's holdings for sums which were assertedly less than market value. Plaintiff's claim for damages based on the dissipation or even diminution of decedent's net worth are rejected as too speculative.

■ Plaintiff offered evidence which established that decedent's income from his law practice had averaged $72,030 per year for the three years immediately preceding his death. An expert economist used the average growth rate of attorney's income, a discount rate based upon current rates of interest, and a personal consumption factor[5] to estimate that the loss of income from decedent's practice of law is $1,394,342, if decedent practiced until he was 65 and $1,747,909 if he practiced until age 70. Since the customary age for retirement is 65 and since plaintiff has offered no evi-

---

5. The court remains somewhat skeptical about the very low personal consumption factor, fifteen percent of annual income, used by plaintiff in calculating lost income from decedent's prac-

tice of law. However, defendant United States offered no evidence to rebut this figure and so the court concludes that it should be accepted.

dence that decedent was likely to have practiced law until age 70, the court finds that the damages to plaintiff should be constituted by the loss of income from decedent's practice of law to age 65 only.

The United States offered no evidence by expert witnesses or otherwise (except as noted below) to counter or qualify the testimony of the expert economist, so that the expert's evaluation, *qua* expert, stands uncontradicted.

The United States offered evidence purporting to show that even if Tiffany had continued to practice law, he would have met with less success than he had in the past. A local Charlottesville attorney testified that he belived decedent had a bad reputation among the Charlottesville bar, that he was not a trustworthy attorney, and that his professional relationships were marked by an absence of fair dealing. However, this testimony establishes considerably less than it purports to. First, this testimony is not sufficiently concrete even to be called anecdotal. Rather, it consisted of conclusory statements and expressions of opinion of the sort more suitable for determining inclusion in a club than evaluating professional standing. Second, the lawyer testified that he practiced very little in Augusta County and the City of Waynesboro, concededly the center of decedent's practice. Finally, when it comes to an evaluation of the hypothetical health of Mr. Tiffany's legal practice, the crucial variable may not be the regard with which at least some other attorneys held Mr. Tiffany, but the regard in which his universe of clients, past, present, and potential, held decedent. One attorney with a long-standing practice of considerable size in the Waynesboro area testified that Mr. Tiffany's reputation among his clients was quite good.[6]

■ Defendant United States did, however, proffer evidence which purports to show that decedent would have been disbarred and, thus, plaintiff herein merits no award of damages based on any loss of income from the practice of law. The United States has attempted to place into evidence an agreement between the decedent (and plaintiff, his wife) and the United States to provide immunity in exchange for information described within the agreement as "privileged."[7] Initially, this court had doubts as to the admissibility of this document out of a concern that the reasoning underlying what are generally described as "Dead Man's Statutes" would render the document inadmissible. However, this action proceeds entirely under a federal statute, and "With respect to federal issues, no Dead Man's Statute is effective." *See,* 2 S. Saltzburg and K. Redden, *Fed.R. of Evid. Manual,* 268 (1977). Thus, as to this point, the court concludes that the document may properly be admitted in evidence. However, as to this document, additional serious concerns are presented, as set out *infra.* While outside the linear reasoning determining the legal effect of this document, there are matters concerning it which deserve comment.

First, this court is concerned about the way this agreement appears to have been unearthed and utilized. Initially, there is the question of the very propriety of such an agreement by which an officer of the court, under the aegis of the United States, seems to violate a basic ethical obligation and disciplinary rule of the legal profession, relating to concealing conduct by a licensed attorney-at-law which the United States now contends is proof of strongly criminal activity on the part of that lawyer.[8] Further, this court is concerned,

---

6. This lawyer's testimony also showed that within his professional strata, decedent's reputation was also quite high among other attorneys in the Waynesboro–Staunton–Augusta County area.

7. By the terms of the agreement, the government is promising not to disclose any information gained by decedent's statement to the Assistant United States Attorney to the Virginia State Bar.

8. "A lawyer having information indicating that another lawyer has committed a violation of the Disciplinary Rules that raises a substantial question as to that lawyer's fitness to practice law in other respects, shall report such information to the appropriate professional authority ..." DR 1–103, Rules of Va. Sup.Ct. Pt. 6, § II.

though to a lesser degree, by the way that the actions of the United States, in divulging the contents of this document, fly in the face of the legal maxim that "the word of the sovereign is its bond."

Perhaps there is some rule or practice or procedure available to the attorneys for the government to engage in this conduct; if so, that fact is unknown to this court and no evidence to show any such license to do so has been presented. If such a rule or practice or procedure does in fact exist, then either that license to act must be changed or the Canons of Professional Responsibility must be changed to accomodate that practice or rule or procedure.

It is true that where serious crime is involved, "government agents may lawfully use methods that are neither appealing nor moral if judged by abstract norms of decency." *See United States v. Bogart,* 783 F.2d 1428, 1438 (9th Cir.1986). Even if true, this quotation gives concern, for it verges too close for comfort on an "end justifies the means" argument. Justice Brandeis, in dissent, dealt succinctly with that argument when he stated, "to declare that in the administration of the criminal law the end justifies the means ... would bring terrible retribution." *See Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

Again, the court notes that these comments lie outside the appropriate reasoning in determining the proper legal effect to be given to this statement.

There has been considerable doubt raised about the admissibility of this evidence, this court having reserved ruling on its admissibility until the factual pattern had been fully developed.[9] The principal doubt

related to the rationale of the Dead Man's Statutes, but, as noted *supra,* this has been resolved in favor of admissibility. The sticking point of admissibility is not alone ultimately dispositive because even if this evidence is admissible, the court finds that it lacks sufficient probative value to sustain the proposition for which it is tendered by the United States. In assessing its probative value, the court first looks at the facial assertion of the evidence and then at the likelihood that this initial assertion will not only turn out to be true but will set into motion all the intermediate steps conveying the probity of the initial assertion to its final thesis.

In this case, the court must examine the likelihood that the statement would lead with some degree of certainty to the disbarment of the decedent. Although the initial assertion, that is, of criminal conduct of the decedent, is set out in the statement, the United States has not shown that the required sequence leading to disbarment would necessarily have followed. Disclosure of the statement occurred before a United States District Court other than this court in what appears to have been an unrelated proceeding.[10] However, in order for this evidence to have sufficient probative value, the court must be convinced that the necessary intermediate inferences are all justified. The court would be called on to accept the presumption stated by the United States that the decedent engaged in criminal conduct, and from that presumption as an underpinning would draw the inference that the decedent would have been disbarred. Such an inference based on a presumption cannot alone support the conclusion the United States attempts to draw, particularly where, according to the testimony of Mr. Wrenn[11], a number of

9. Since this was a court trial, no problems of taking testimony out of the presence of the jury, etc., were raised by reserving this ruling.

10. This court is careful to note that the judge acted promptly and with perspicuous conscientiousness in immediately meeting his professional obligations and passing the information to the State Bar.

11. The United States called upon an attorney, Mr. Wrenn, whose private practice now involves

representing lawyers in bar disciplinary proceedings and who previously was first, Bar Counsel and then Special Counsel to the Virginia State Bar. Mr. Wrenn testified to the inverted "cursus honorum" which would have eventuated if a disciplinary action against decedent had been pursued. While Mr. Wrenn certainly qualifies as an expert in the machinations of state bar governance procedures, he does not qualify as an expert in sibylline procedures or soothsaying. Indeed, Mr. Wrenn testified that

intermediate steps of investigation, hearings, and appeals would have to occur before the conclusion advanced by the United States would have occurred. There is no record evidence that any of these steps had been taken or even initiated. The record only discloses that the statement had been referred by the judge to an appropriate member of the disciplinary body in the decedent's jurisdiction. That is, this court would have to find that decedent would have lost his case at every point in the State Bar disciplinary process and would have received the ultimate sanction of disbarment. This court refrains from reaching that conclusion, especially since this information was, by virtue of the proper action taken by the federal judge who became aware of the allegations or admissions in the agreement, in the possession of that disciplinary body for a period prior to the death of the decedent and, as stated, no action disclosed in the record had been taken against the decedent. The court finds that the evidence proffered by the United States which purports to show that decedent would have been disbarred has insufficient probative value to support that conclusion.

### IV.

This court finds that the proximate cause of the collision between decedent's aircraft and the F4–C interceptor were the superseding negligent acts of defendant United States. It further finds that defendant United States is liable to plaintiff in the sum of $1,394,342.00 due to lost income from his practice of law, and to defendant Brandon Ladd Corporation the sum of $45,000 for the loss of its aircraft.

An appropriate Order shall this day issue.

---

"My entire opinion is based on a hypothesis." Mr. Wrenn could not predict what would have happened with regard to state bar proceedings had decedent lived and, in point of fact, Mr. Wrenn took some care to avoid such speculation. The testimony of Mr. Wrenn is not helpful to the government in its attempt to undercut plaintiff's plea for damages due to lost income from decedent's practice of law, because Mr. Wrenn cannot testify to facts unique to decedent's specific situation.