931 F.2d 271
 Patsy O. TIFFANY, Administratrix and Personal Representative
of the Estate of Henry H. Tiffany, Deceased,
Plaintiff-Appellee,
v.
UNITED STATES of America, Defendant & Third Party Plaintiff-Appellant,
v.
BRANDON LADD CORPORATION, Third Party Defendant-Appellee.
Patsy O. TIFFANY, Administratrix and Personal Representative
of the Estate of Henry H. Tiffany, Deceased,
Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant & Third Party Plaintiff-Appellee,
v.
BRANDON LADD CORPORATION, Third Party Defendant-Appellee.
 Nos. 90-3014, 90-3022.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 7, 1991.
Decided April 30, 1991.
 
 Thomas Barton Almy, Sr. Aviation Counsel, Civ. Div., U.S. Dept. of Justice, Washington, D.C., argued (Stuart M. Gerson, Asst. Atty. Gen., Civ. Div., U.S. Dept. of Justice, Washington, D.C., John P. Alderman, U.S. Atty., E. Montgomery Tucker, Asst. U.S. Atty., Roanoke, Va., of counsel), for defendant and third party plaintiff-appellant U.S.
 Wilton Jeremain Smith, Gilman, Olson & Pangia, Washington, D.C., argued (Michael J. Pangia, Gilman, Olson & Pangia, Washington, D.C., Frank Anthony Mika, Waynesboro, Va., on brief), for plaintiff-appellee Tiffany.
 Wilton Jeremain Smith, Gilman, Olson & Pangia, Washington, D.C., argued (John J. Tigert, VI, Kathryn A. Ledig, Taft, Stettinius & Hollister, Washington, D.C., on brief), for third party defendant-appellee Brandon Ladd Corp.
 Before WILKINSON and WILKINS, Circuit Judges, and ELLIS, District Judge for the Eastern District of Virginia, sitting by designation.
 WILKINSON, Circuit Judge:
 
 
 1
 Henry Tiffany and six passengers were killed following a midair collision between their Beech Baron airplane and a United States F-4C fighter jet. Tiffany had failed to activate a flight plan and thus had entered an air defense zone off the eastern coast of the United States as an unidentified and potentially hostile aircraft. Military authorities had dispatched two fighter jets to identify visually the unknown plane. The collision occurred in poor weather conditions seconds after one of the jets instituted a sharp left bank to avoid Tiffany's Baron. Tiffany's widow brought suit against the United States under the Death on the High Seas Act, 46 U.S.C.App. Secs. 761-68, alleging that the military pilot and ground control had been negligent in their conduct of the intercept. The district court, 726 F.Supp. 129 returned a verdict in favor of Tiffany. Because to entertain the allegations of negligence in this case would lead us to violate separation of powers principles which inform the discretionary function exceptions to the Federal Tort Claims Act and the Suits in Admiralty Act, we reverse the judgment.
 
 I.
 
 2
 Henry Tiffany, a licensed civilian pilot, planned to fly his small Beech Baron airplane with six passengers from Nassau, Bahamas to Norfolk, Virginia on January 3, 1983. Although Tiffany was aware that the United States Customs Service required him to pass through Customs in Florida, see 19 C.F.R. Sec. 6.14 (1983) (in 47 Fed.Reg. 12,621-22 (1982)), he nevertheless attempted to file with the Bahamian Flight Service Station a flight plan for direct travel to Wilmington, North Carolina instead. The Bahamian authorities refused to accept Tiffany's initial flight plan and persuaded Tiffany to modify the plan to include a stop at Fort Pierce, Florida in order to satisfy the Customs requirement.
 
 
 3
 Filed flight plans are vital for all planes traveling into United States air zones. This is true not only because of Customs regulations but because of our system of national defense as well. Extending hundreds of miles into the Atlantic Ocean from the eastern coast of the United States is an Air Defense Identification Zone (ADIZ) established by the North American Air Defense Command (NORAD), an agent of the Department of Defense. NORAD is a joint military command composed of American and Canadian forces which have responsibility for maintaining the aerial defense of the North American continent. Its peacetime mission is "to detect and identify any unusual air activity within the perimeter areas of the North American Continent which might be prejudicial to the national interests, or indicate an imminent air attack against vital targets in the United States and Canada, and to restrict violations of sovereign airspace." NORAD Regulation 55-14 p 2.a (May 5, 1980). To achieve these goals, NORAD must identify "[a]ll airborne objects detected entering or operating within an identification zone." Id. p 5.a.
 
 
 4
 Both to facilitate that task and to protect civilian aircraft, Federal Aviation Regulations require all aircraft intending to penetrate an ADIZ to first file a flight plan. 14 C.F.R. Sec. 99.11 (1983). If NORAD radar shows an aircraft in the ADIZ and that aircraft correlates with a filed flight plan, then NORAD can classify the plane as "friendly" and take no further steps towards verifying its identity. If the observed aircraft does not correlate with a filed flight plan, then NORAD must investigate further. This process is often accomplished by launching armed fighter planes to observe and visually identify the unknown aircraft. Relevant information may also be collected from a number of sources, including Customs officials, adjacent air defense control facilities, other aircraft in the vicinity of the unknown, and civilian Air Traffic Control facilities, which may possess late flight plan or radar information.
 
 
 5
 NORAD has two minutes from the time it first detects an aircraft in an ADIZ to classify it as "friendly." NORAD Regulation 55-14 p 5.c. After that time it must classify the aircraft as "unknown" and "continuously pursue[ ]" all methods of identification. Id. p 6.b.3. No classification is ever permanent; even a plane initially recognized as "friendly" can be reclassified if it creates "suspicion as to its intent by reason of course, speed, altitude, radio/telephone procedures, maneuvers, flight size ... or other abnormality." Id. pp 5.c.1, 6.b.2. In 1982, the year before Tiffany's crash, the 20th NORAD Region, operating out of Fort Lee Air Force Station near Petersburg, Virginia, encountered two hundred thirty-eight "unknown" planes. Interceptor aircraft were launched in one hundred ninety-two instances and visually identified sixty-six planes. The remainder were reclassified "friendly" on the basis of information received from other military or civilian facilities. Also in 1982, the 20th NORAD Region intercepted ten Soviet bloc aircraft operating off the east coast between Florida and Virginia.
 
 
 6
 Despite the tremendous practical importance as well as the legal necessity of filing accurate flight plans, Tiffany left Nassau slightly before 2:00 p.m. on January 3 without ever activating his modified flight plan. Flight plans that have been filed but not activated within one hour of takeoff are considered void. Thus, Tiffany was flying without an official flight plan and without any verified destination. Apparently he had decided against complying with Customs regulations and instead chosen to follow his original plan to fly directly north from Nassau. In addition, although other federal regulations required that he contact FAA traffic controllers in the United States before entering an ADIZ, 14 C.F.R. Sec. 99.21 (1983), Tiffany failed to establish radio contact with any FAA Air Traffic Control facility until 4:31 p.m., when he was well within the ADIZ--by his estimate a mere fifty miles off the North Carolina coast.
 
 
 7
 A few minutes after 4:00 p.m., the 20th NORAD Region's radar system in Fort Lee, Virginia (FERTILE) detected an aircraft within the ADIZ that was heading north towards the North Carolina coast. The plane did not correlate with any filed flight plan and NORAD consequently classified it as "unknown." Two F-4 fighter planes were launched from an Air Force base in North Carolina to determine visually the type of the unidentified aircraft. The military planes reported "popeye" conditions at altitudes below thirteen to fourteen thousand feet, meaning that visibility was extremely restricted because of clouds. One of the F-4's attempted to make a visual identification pass of the unknown plane but its angle of approach was too steep and the pass was canceled.
 
 
 8
 Meanwhile, Tiffany had established radio contact at 4:31 p.m. with Federal Aviation Administration (FAA) air traffic controllers in Leesburg, Virginia. Although his Baron did not yet appear on the FAA radar system, Tiffany informed the controllers that he was approximately fifty miles south of New Bern, North Carolina and flying at an altitude of 9500 feet. At 4:37 p.m., however, he corrected his position and indicated he was actually fifty-six miles from Wilmington, North Carolina, a city located seventy-five miles southwest of New Bern. He also gave the air traffic controllers the make and model of his aircraft, information that NORAD would require before changing the plane's status to "friendly" based on FAA communications.
 
 
 9
 Both the FAA and Tiffany, as civilian entities, operated on VHF radio frequencies, while the military operated on UHF frequencies. Thus, although Tiffany could communicate with the FAA, and the F-4's could communicate with NORAD ground control (FERTILE), the Baron and the military aircraft could not contact each other. Exchanges between the military and civilian systems could occur only through separate ground circuits. Information that Tiffany relayed to FAA controllers thus had to pass through numerous hands to reach decision makers at FERTILE, a process which incorporated some delay. FERTILE control was in contact with the FAA throughout the intercept process.
 
 
 10
 At 4:41 p.m., a few minutes after Tiffany had given civilian authorities his corrected position, one of the F-4's, with call sign "JL-26," established contact with Tiffany's Baron by on-board radar. Seconds later, that plane "called a Judy," or indicated that it was taking control of the intercept and would complete the identification through use of its on-board radar. What happened next is not entirely clear. At 4:42:20, the FAA sent a message to FERTILE which indicated that it had positively identified Tiffany by radar and that the Baron was six to seven miles ahead of the fighter planes. Although FERTILE received at least part of this transmission, an official transcript showed that some of the message had not been received. Nevertheless, at 4:43:42, the status of the unknown track was changed to "friendly" in FERTILE's computer system, and at 4:44:21, the FERTILE control officer decided to terminate the intercept. That decision was relayed to plane JL-26 at 4:44:42, a few seconds before the collision.
 
 
 11
 During this period, JL-26 had been approaching Tiffany from behind; the fighter was below the Baron and to its left, according to both the ground radar reconstruction and the pilot's testimony based on his on-board radar. Ground control had instructed the F-4 to maintain at least a five hundred foot separation from the unknown. As JL-26 drew nearer, its radar screen displayed a "Break X," meaning that the plane had approached so close to the target that it could not fire its missiles. A Break X occurs at a distance of approximately one-half nautical mile. The F-4 then initiated a sharp left bank to break off the intercept.
 
 
 12
 While JL-26 was rapidly gaining ground, FAA controllers informed Tiffany that two F-4's were behind him. They also requested that Tiffany head towards New Bern, North Carolina instead of towards Norfolk. That direction would have required that Tiffany make a left turn. The FAA transcript shows that around 4:44 p.m., Tiffany responded, "we're fading to the right ah we've deviated ... yea we can go direct New Bern now." Within seconds, the F-4's left wing collided with the Baron. The smaller plane fell into the Atlantic and no survivors were located. Although damaged, the F-4 was able to return to its home base.
 
 
 13
 The accident proved a difficult one to reconstruct. A radar reconstruction report by the National Transportation Safety Board (NTSB) confirmed that the F-4 had been steadily gaining altitude and then initiated a sharp left turn (roll angle of greater than twenty degrees) at least eight seconds before it collided with Tiffany's Baron. A second report by the NTSB analyzed the damage to the F-4's left wing and the relative air speeds of the two airplanes. That collision report indicated that the F-4 had been descending relative to the Baron, and that the difference in roll (or turn) angle between the two planes had been only 3.6 degrees. The NTSB harmonized the two reports by concluding that the Baron had also initiated a left turn. If the Baron had not changed altitude but had begun a left turn, the ascending F-4 could have impacted the smaller plane and the difference in turning angles would have appeared as if the F-4 had been descending on the Baron. The radar reconstruction did not indicate that Tiffany had initiated a left turn, however. Possible explanations of that discrepancy include a masking effect due to the larger F-4, a gap in the radar coverage due to the time between radar antenna revolutions, and an error in the collision report because Tiffany did not actually turn left.
 
 
 14
 Tiffany's wife, as the representative of his estate, brought suit in the United States District Court for the Western District of Virginia against the United States under the Death on the High Seas Act (DOHSA), 46 U.S.C.App. Secs. 761-68, claiming that the United States negligently caused Tiffany's death. Brandon Ladd Corporation, which leased the Beech Baron to Tiffany, sought damages from the United States to compensate for the loss of the plane. The United States brought a counterclaim against Tiffany's estate for damage to the F-4 jet and sought contribution from Brandon Ladd as a third-party defendant. The survivors of the six passengers initiated suits against both Tiffany and the United States which were settled.
 
 
 15
 A bench trial was conducted. The district court found that the government was negligent because it failed to terminate the intercept when it had sufficient information to do so, because ground control failed to tell the pilot of JL-26 to correct a 180 foot error in its altimeter, and because the pilot "continued a mission designed for a visual identification in weather effectively precluding such an identification, misidentified the position of the Baron aircraft relative to its position, turned left and ascended when the procedures called for a descent and a right turn, and failed to maintain the proper amount of vertical separation." The court found the United States liable to Tiffany's estate for $1,394,342 in lost income from Tiffany's law practice, and liable to Brandon Ladd for $45,000 for the loss of the Baron.
 
 
 16
 The United States appeals.
 
 II.
 
 17
 The negligence alleged in this case necessarily calls into question the government's most important procedures and plans for the defense of the country. Because providing for the national security is both a duty and a power explicitly reserved by the Constitution to the executive and legislative branches of government, the judiciary must proceed in this case with circumspection. If we were to hold that the United States acted negligently in conducting the defense of its eastern border, we would be interjecting tort law into the realm of national security and second-guessing judgments with respect to potentially hostile aircraft that are properly left to the other constituent branches of government.
 
 A.
 
 18
 We first proceed to address the relation between separation of powers principles and the relevant federal statutes. Section 2 of the Suits in Admiralty Act (SAA), codified as amended at 46 U.S.C.App. Secs. 741-52, allows suits against the United States if the plaintiff would have been able to bring an admiralty claim against a private party which acted as the government did. 46 U.S.C.App. Sec. 742. Because the Death on the High Seas Act (DOHSA) provides Tiffany a cause of action in admiralty, see 46 U.S.C.App. Sec. 761, the SAA allows the suit to proceed without a sovereign immunity bar. See Williams v. United States, 711 F.2d 893, 895 (9th Cir.1983).
 
 
 19
 That a federal statute enables the courts to assert jurisdiction only begins the analysis, however. Constitutional demands must still be satisfied. Separation of powers is "a doctrine to which the courts must adhere even in the absence of an explicit statutory command." Canadian Transport Co. v. United States, 663 F.2d 1081, 1086 (D.C.Cir.1980). That doctrine requires that we examine the relationship between the judiciary and the coordinate branches of the federal government cognizant of the limits upon judicial power. The Supreme Court, in Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), identified a number of factors, any one of which may carry a controversy beyond justiciable bounds:
 
 
 20
 a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
 
 
 21
 Thus, if resolution of the issues presented by Tiffany requires us to move outside the customary areas of judicial competence or if other "prudential considerations counsel against judicial intervention," Goldwater v. Carter, 444 U.S. 996, 998, 100 S.Ct. 533, 534, 62 L.Ed.2d 428 (1979) (Powell, J., concurring), then we must conclude that the controversy is nonjusticiable.
 
 
 22
 In tort cases brought against the government, these constitutional concerns are addressed through recognition of a "discretionary function" exception to government liability. The Federal Tort Claims Act (FTCA), which governs accidents occurring within the borders of the United States, did not waive sovereign immunity for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. Sec. 2680(a). The Supreme Court has further recognized Congress' belief that "claims of the kind embraced by the discretionary function exception would have been exempted from the waiver of sovereign immunity by judicial construction." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 810, 104 S.Ct. 2755, 2762, 81 L.Ed.2d 660 (1984). It is plain that the discretionary function exception to tort liability serves separation of powers principles by "prevent[ing] judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Id. at 814, 104 S.Ct. at 2765. Were it otherwise, the cumulative force of liability "would seriously handicap efficient government operations." United States v. Muniz, 374 U.S. 150, 163, 83 S.Ct. 1850, 1858, 10 L.Ed.2d 805 (1963).
 
 
 23
 The respect for separation of powers principles addressed through the discretionary function exception of the FTCA has been carried over into suits brought under DOHSA and SAA. Our recognition of the constitutional constraints on actions brought under those acts is not a novel phenomenon. We held in Tozer v. LTV Corp., 792 F.2d 403 (4th Cir.1986), that a negligence action pursuant to DOHSA and SAA could not be maintained against a government military contractor because of separation of powers concerns. There we noted that it would have been unseemly for "a democracy's most serious decisions, those providing for common survival and defense, [to] be made by its least accountable branch of government." Id. at 405. Earlier, in Faust v. South Carolina State Highway Dept., 721 F.2d 934 (4th Cir.1983), this court refused to review a negligence claim in admiralty that challenged the Corps of Engineers' discretionary issuance of a permit.* Each circuit that has considered the matter has concluded that actions brought under the SAA which would require the court to re-examine discretionary acts taken by the government must be dismissed. See Gercey v. United States, 540 F.2d 536, 539 (1st Cir.1976); In re Joint E. and S. Dists. Asbestos Litigation, 891 F.2d 31, 35 (2d Cir.1989) [hereinafter Asbestos]; Sea-Land Serv., Inc. v. United States, 919 F.2d 888, 891 (3d Cir.1990); Wiggins v. United States, 799 F.2d 962, 966 (5th Cir.1986); Gemp v. United States, 684 F.2d 404, 408 (6th Cir.1982); Bearce v. United States, 614 F.2d 556, 560 (7th Cir.1980); United States Fire Ins. Co. v. United States, 806 F.2d 1529, 1535 (11th Cir.1986); Canadian Transport Co. v. United States, 663 F.2d 1081, 1086 (D.C.Cir.1980); see also Complaint of Valley Towing Serv., 609 F.Supp. 298, 301 (E.D.Mo.1985); Olympia Sauna Compania Naviera, S.A. v. United States, 670 F.Supp. 1498, 1504 (D.Or.1987), aff'd without opinion, 1989 Am. Maritime Cases 1216 (9th Cir.1988). "Were there no such immunity for basic policy making decisions, all administrative and legislative decisions concerning the public interest ... would be subject to independent judicial review in the not unlikely event that the implementation of those policy judgments were to cause private injuries." Gercey, 540 F.2d at 539. We agree that assumption of such powers would be "intolerable under our constitutional system of separation of powers." Asbestos, 891 F.2d at 35.
 
 
 24
 While the doctrine of discretionary functions recognized under the FTCA and DOHSA thus informs our inquiry into the disposition of the present controversy, the discretionary function exception alone does not capture all the important aspects of this case. For "[j]usticiability is of course not a legal concept with a fixed content or susceptible of scientific verification. Its utilization is the resultant of many subtle pressures...." Poe v. Ullman, 367 U.S. 497, 508, 81 S.Ct. 1752, 1758, 6 L.Ed.2d 989 (1961) (Frankfurter, J.) (cited in Flast v. Cohen, 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968)).
 
 B.
 
 25
 The present controversy implicates a discretionary decision of the most serious sort. It involves a civilian injury that followed from actions taken in actual military defense of our country. Of the legion of governmental endeavors, perhaps the most clearly marked for judicial deference are provisions for national security and defense. See Rostker v. Goldberg, 453 U.S. 57, 64-67, 101 S.Ct. 2646, 2651-53, 69 L.Ed.2d 478 (1981). The decisions whether and under what circumstances to employ military force are constitutionally reserved for the executive and legislative branches. See, e.g., U.S. Const. art. II, Sec. 2; art. I, Sec. 8. With regard to decisions to employ military troops, "it is not the function of the Judiciary to entertain private litigation ... which challenges the legality, the wisdom, or the propriety of the Commander-in-Chief in sending our armed forces abroad or to any particular region." Johnson v. Eisentrager, 339 U.S. 763, 789, 70 S.Ct. 936, 949, 94 L.Ed. 1255 (1950). "Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters." Chappell v. Wallace, 462 U.S. 296, 301, 103 S.Ct. 2362, 2366, 76 L.Ed.2d 586 (1983) (quoting Orloff v. Willoughby, 345 U.S. 83, 94, 73 S.Ct. 534, 540, 97 L.Ed.2d 842 (1953)).
 
 
 26
 The strategy and tactics employed on the battlefield are clearly not subject to judicial review. See, e.g., DaCosta v. Laird, 471 F.2d 1146, 1155-56 (2d Cir.1973) (challenge to presidential directive to mine Vietnamese harbors and continue air and naval strikes presents a nonjusticiable political question). "[T]he same considerations which preclude judicial examination of the decision to act must necessarily bar examination of the manner in which that decision was executed by the President's subordinates." Rappenecker v. United States, 509 F.Supp. 1024, 1030 (N.D.Cal.1980). Not only do courts lack the expertise to evaluate military tactics, but they will often be without knowledge of the facts or standards upon which military decisions have been based. Id. at 1029 (alleged negligence in military action to free a captured vessel was nonjusticiable).
 
 
 27
 It matters not that the military decision here involves the defense of national borders rather than the projection of force abroad. The elementary canons of judicial caution are not limited to actions taken during actual wartime, but may extend to many other aspects of military operations. In declining to rule on the allegation that the training, weaponry and orders of a state National Guard program made inevitable the unnecessary use of fatal force, the Supreme Court declared:
 
 
 28
 It would be difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches directly responsible--as the Judicial Branch is not--to the electoral process. Moreover, it is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches.
 
 
 29
 Gilligan v. Morgan, 413 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973).
 
 
 30
 So too does this case beckon courts into "complex, subtle, and professional [military] decisions," involving here the identification and interception of potentially hostile aircraft in our air zones. The Court declined to be drawn into such discretionary military decisions in Boyle v. United Technologies Corp., 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), where a Marine helicopter pilot's estate sued the government for an allegedly defective aircraft design. It recognized that selection of an appropriate design for military equipment was a function reserved for the armed forces because such decisions involved "not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness." Id. at 511. To have permitted state tort law to enter and alter the equation would have been to allow judicial reappraisal of judgments that is constitutionally forbidden. Id.; see Varig Airlines, 467 U.S. at 814, 104 S.Ct. at 2765.
 
 
 31
 We likewise hold that Tiffany cannot reshape the national response to threats of hostile air attack through the mechanism of tort law. Because Tiffany failed to comply with federal regulations, NORAD confronted an unidentified aircraft which had entered an air defense zone initially undetected, and which was heading directly for the continental United States. The potential danger to American lives that such a scenario presents is apparent. NORAD was forced to initiate protective measures.
 
 
 32
 The executive and legislative branches have accorded NORAD the authority and the substantial responsibility of protecting the nation's borders. Thus, NORAD is the party that must balance the "many technical, military, and even social considerations" when developing a system of identifying unknown aircraft. Boyle, 487 U.S. at 511, 108 S.Ct. at 2517. It must weigh the necessity of precise identification against the resulting risks to its own pilots' safety and it must balance the need to protect the civilian population on the ground with the need to protect civilian aircraft which enter into air defense zones without filing flight plans.
 
 
 33
 Such delicate appraisals of relative dangers were not ultimately consigned by Congress to the courts. Courts are not in a position to dictate to a branch of the Department of Defense how it should react when it faces unknown and potentially hostile aircraft. Myriad possibilities for mischievous judicial inquiry abound: whether planes should have been sent at all; the proper number of planes; the routes they flew; the angles of the intercepts; the correct distance from the target; the proper reaction to weather conditions; the quality of the on-board radar system; the compatibility of communications systems. The list of inquiries is virtually endless and the umbrella of negligence would encompass them all. Courts cannot impose their own concept of "the prudent intercept" on NORAD. Judges have no "judicially discoverable and manageable standards for resolving" whether necessities of national defense outweigh risks to civilian aircraft. Baker v. Carr, 369 U.S. at 217, 82 S.Ct. at 710. Nor can we even "undertak[e] independent resolution without expressing lack of the respect due coordinate branches of government." Id. Any judgment we might render would lay upon NORAD a strata of tort law which would be both capricious and confining in its impact.
 
 III.
 
 34
 Tiffany argues nonetheless that this court can award her a recovery without expressing any lack of respect for coordinate branches of government. In her view, the protected decisions with which we should not interfere have already been made in the form of NORAD and USAF regulations, manuals, and procedures. Thus, she contends, the court can inquire into whether government agents followed those regulations without exercising authority to which it is not entitled. See Berkovitz v. United States, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988). An alleged failure to follow regulations is not only justiciable, she believes, but presents a case of actionable negligence.
 
 
 35
 Three reasons counsel rejection of this argument. First, the mere fact that NORAD established routine operating procedures cannot convert this dispute into a justiciable issue when so many other factors counsel against judicial intervention. Second, we do not believe that each NORAD or Air Force regulation that designates internal operating procedures automatically gives rise to an actionable duty in tort to comply with them. Third, an examination of the regulations in question reveals that they actually reserve a great deal of discretion for the parties who must conduct the defensive maneuvers.
 
 
 36
 First, to say that because internal regulations exist, the barriers to judicial involvement are removed is too simple a proposition. Instead, we must inquire "into the precise facts and posture of the particular case" while noting "the impossibility of resolution by any semantic cataloguing." Baker v. Carr, 369 U.S. at 217, 82 S.Ct. at 710. Even if we were to agree that the regulations provided standards against which NORAD's conduct could be measured, that conclusion would hardly compel that the courts do so if other "prudential considerations" counseled against it. Goldwater v. Carter, 444 U.S. at 998, 100 S.Ct. at 534 (Powell, J., concurring).
 
 
 37
 Here, we conclude that precisely such other powerful factors foreclose judicial entertainment of Tiffany's assertions. Those factors have been discussed at length in the preceding section and shall not be repeated here. Simply put, NORAD must have some freedom to design and to conduct missions with regard to hostile aircraft without fear that courts will afterwards assess damages in the belief that the mission might have been accomplished better. The presence of regulations does not change the reality that legislative and executive oversight of these particular military missions is to be preferred to that of the judiciary. Each intercept may present a unique situation and demand a different response dependent not only upon factors such as the prevailing weather conditions and available information, but upon the state of foreign relations and international tensions. In adapting to such variable circumstances, the extent of compliance with relevant NORAD manuals and regulations may be anything but clear. Indeed, determining the extent of compliance with operating procedures and regulations can itself be an endlessly argumentative exercise. This determination must be in the first instance a matter for military judgment, subject always to the "power of oversight and control of military force by elected representatives and officials which underlies our entire constitutional system...." Gilligan v. Morgan, 413 U.S. at 10, 93 S.Ct. at 2446.
 
 
 38
 We do not hold, of course, that any time a branch of the military asserts a national defense interest to justify its acts, the court must avert its eyes. The military does not enjoy a blanket exemption from the need to proceed in a non-negligent manner. When conducting training exercises, for example, or acting in a civilian arena, national defense interests may be more remote and the military faces different restrictions. See, e.g., Peterson v. United States, 673 F.2d 237 (8th Cir.1982) (B-52 plane on training mission liable for flying too low in altitude); Ward v. United States, 471 F.2d 667 (3d Cir.1973) (Air Force might be liable for negligently causing sonic booms). Nor do we here address the situation where a civilian pilot properly filed and activated a flight plan and the government negligently misplaced it. Those are different circumstances from ones where actual military force was initiated to investigate a potentially hostile aircraft.
 
 
 39
 We also cannot accept Tiffany's assumption that NORAD regulations automatically create an actionable duty in tort towards civilians. Tiffany does not argue, as did the plaintiffs in Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), that the government violated any federal laws contained either in statutes or in formal published regulations such as those in the Code of Federal Regulations. "There can be no doubt that the mandate of a federal statute is a far stronger foundation for the creation of an actionable duty ... than [an] administrative directive...." Zabala Clemente v. United States, 567 F.2d 1140, 1150 (1st Cir.1977). As the First Circuit explained while addressing whether FAA inspectors owed a duty to the public:
 
 
 40
 [P]laintiffs cannot use the implicit sovereignty of the government to argue that all its internal communications establish standards of care similar to those created by duly promulgated laws of general application. Not all acts and orders of the United States government are so sovereign that they must be treated as commands which create legal duties or standards, the violation of which involves breaking the law. A considerable part of the government's conduct is in the context of an employer-employee relationship, a relationship which includes reciprocal duties between the government and its staff, but not necessarily a legal duty to the citizenry.
 
 
 41
 Zabala Clemente, 567 F.2d at 1144. The court finally concluded that an order to FAA staff to conduct inspections, although mandatory, did not create an actionable duty to passengers: "[w]e do not believe the Federal Tort Claims Act was intended to expose the government to such limitless liability...." Id. at 1146.
 
 
 42
 Similarly, when Soviet military aircraft shot down a commercial airliner that had strayed into Soviet air space, relatives of passengers killed in the crash argued that NORAD should have warned the airliner of its position. The alleged duty to warn was based on Alaskan NORAD Region/Alaskan Air Command Regulation 60-1, which provided: "[i]f it looks like an aircraft is lost or may enter the Alaskan non-free flying area ... tell the nearest Federal Aviation Administration Flight Service Station for civil aircraft...." In re Korean Air Lines Disaster of September 1, 1983, 646 F.Supp. 30, 34 (D.D.C.1986). While it was undisputed that the regulation was an internal military directive that was binding on military personnel, the court held that "[t]he testimony of personnel working on an operational level that they believed they were required to obey Reg. 60-1 does not support Plaintiffs' contention that the United States owed a duty to Plaintiffs' decedents." Id. The regulation was simply inadequate to show that the United States had "assumed ultimate responsibility for rescuing civilian flights." Id. at 34-35.
 
 
 43
 Tiffany has similarly not shown that NORAD guaranteed through operational procedures the safety of all civilian aircraft which enter an ADIZ without a flight plan. On the contrary, it is difficult to see how the government actually could make such a guarantee. Moreover, to base tort liability in this situation on a failure to follow internal regulations would have few positive outcomes. NORAD might well respond by setting fewer procedures and regulations if each could give rise to civilian tort suits. Such action could only result in increased confusion and a loss of military efficiency. Nor would any worthwhile goals be achieved if NORAD were to state in boilerplate throughout its regulations that the rules are not meant to create tort duties, or if NORAD responded by promulgating regulations of a most permissive nature, designed to retain maximal flexibility. Reflection upon such consequences underscores the dangers of the intrusion of undue tort liability into NORAD's regulatory calculus.
 
 
 44
 Finally, many of the regulations that Tiffany argues were not followed actually preserve significant discretion for the necessary actors. For example, NORAD Regulation 55-14 (May 5, 1980) addresses the procedures for identification of air traffic:
 
 
 45
 Once intercept action has been initiated against an "Unknown," positive visual recognition will be completed within tactical and safety limitations, unless the track can be positively reclassified "Friendly" by other means prior to intercept. If there is reasonable doubt as to validity of identification information ... visual recognition will be completed.
 
 
 46
 NORAD Regulation 55-14 p 6.b.4 (May 5, 1980). Large areas of discretion reside within the above directive. The regulation does not explain what circumstances might give rise to "reasonable doubt" about the validity of information, for example.
 
 
 47
 Perhaps more importantly, the duty to identify rests on the classification of the target aircraft as an "unknown," and that classification is discretionary. The regulation lists many methods by which a plane can be declared "friendly" but does not require NORAD to so declare it even when the conditions have been fulfilled. Instead the methods are merely permissive:
 
 
 48
 A track may be classified "Friendly" if it follows a plan of flight in accordance with a prior arrangement between the ADCF concerned and the aircraft operator[;] ... voice authentication over air/ground channels ... may be used as a means of determining the "Friendly" identity of military aircraft[;] ... [if] there is a strong possibility that the aircraft in question should correlate with a flight plan received by the NORAD system, the track in question may be declared "Friendly" if it is transmitting a MODE 3/A code assigned by FAA/TC[;] ... Positional information obtained [via ATC agencies] may be used to establish a reclassification of "Friendly."
 
 
 49
 Id. pp 6.a.4, 6.a.6 to 6.a.8 (emphasis added). Not only are the classification requirements permissive; they are also fluid. Aircraft can be relabeled based on subsequent information received at any time. Id. p 5.c.1. Paragraph 6.b.2 allows controllers to classify as "unknown" "[a]ny track, regardless of its location, creating suspicion as to its intent by reason of course, speed, altitude, radio/telephone procedures, maneuvers, flight size, ECM activity, or other abnormality to an extent that further investigation is deemed advisable." These regulations make clear that NORAD's categorization of aircraft and decisions as to the necessity of completing a visual identification are discretionary in a way that would likely be immunized, even under Tiffany's proposed analysis.
 
 
 50
 Many of the tactics employed to conduct the intercept are similarly discretionary in nature. An attachment to NORAD Regulation 55-14 instructs that "VFR and IFR interception patterns will be in accordance with standard tactics prescribed by the component command to whom the interceptor is assigned." Attachment 2 p 1.e. Thus tactics may vary from command to command. In addition, the United States Air Force Interceptor Weapons Instruction Manual 51-14 (May 15, 1978) informs pilots to "[k]eep in mind that there should never be a 'standard' tactic and that the areas mentioned here are more aimed at thought processes than actual solutions." Ch. 6 (Visual Identification Intercepts) 6-1. The district court observed that pilots also retain the authority to "call a Judy," or to take control of the intercept through use of on-board radar. Finally, Regulation 55-14 p 9 explains that "NORAD/ADCOM region commanders are authorized to supplement this regulation, as required, to establish specific responsibilities and operating procedures for their area."
 
 
 51
 To hear Tiffany describe an intercept, the whole operation is simply a rote mechanical exercise. Actually it is in significant respects flexible and judgmental in nature. Tiffany's assertions that NORAD was negligent in not classifying the Baron as "friendly" more quickly and in approaching it at a wrong angle, for example, fall into the realm of discretion reserved by the regulations themselves.
 
 
 52
 Therefore, the presence of NORAD regulations which speak to intercept procedures does not change our analysis. We continue to believe that the issues raised by Tiffany are not for resolution by the courts, but are best left to those branches of government whose expertise is greater and whose political accountability is more direct.
 
 IV.
 
 53
 It should be obvious that NORAD's military strategy does not project midair collisions as an element of the nation's defense. It should also be apparent that NORAD possesses a keen interest in the safety of its own personnel and in that of other pilots and passengers. Because manned intercept procedures will always place NORAD's own reputation, equipment, and personnel at risk, the intercept system itself has incentives to assure the safety of those who use the air. To redesign the incentives through tort law, however, holds hazards of its own. This tragedy occurred in midair; an aircraft undetected by a risk-averse defense system might one day visit a different sort of disaster, as lamentable in its own way as this one is.
 
 
 54
 The judgment of the district court is reversed and the case is remanded with directions to dismiss. The government's counterclaim is also dismissed.
 
 
 55
 REVERSED AND REMANDED.
 
 
 
 *
 In noting that "[i]t has authoritatively been held that the exercise of the function to issue permits is an unreviewable discretionary function," the court in Faust necessarily narrowed Lane v. United States, 529 F.2d 175 (4th Cir.1975), and recognized the existence of a discretionary function exception to the Suits in Admiralty Act in some circumstances. 721 F.2d at 939. We think for the reasons stated herein that this is one of those circumstances