Timothy K. **DUNAWAY**

v.

**UNITED STATES Of America, et al.**

No. Civ.A. 98–2035.

United States District Court,
E.D. Louisiana.

Sept. 2, 1999.

Irving Jay Warshauer, Gainsburgh, Benjamin, David, Meunier & Warshauer, New Orleans, LA, for Timothy K. Dunaway.

Craig Joseph Robichaux, Talley, Anthony, Hughes & Knight, LLC, Mandeville, LA, Gustave A. Fritchie, III, Irwin, Fritchie, Urquhart & Moore, L.L.C., New Orleans, LA, for Rodney Strain.

## *ORDER AND REASONS*

VANCE, District Judge.

Before the Court is defendant, United States' motion to dismiss this case for lack of subject matter jurisdiction, or alternatively for summary judgment. The United States claims it has not waived sovereign immunity for the conduct in issue. The Court agrees, and the defendant's motion for summary judgment is granted.

### I. Background

On April 12, 1998, Timothy Dunaway ran aground on a sandbar that had formed in the Pearl River Navigational Canal.[1] The United States Army Corps of Engineers completed the canal in 1958, pursu-

---

1. Canal is referred to interchangeably as "waterway" and "project."

ant to the authorization conferred by the River and Harbor Act of 1935. It designed the waterway to provide a minimum depth of 7 feet for navigation from the mouth of the West Pearl River to the vicinity of Bogalusa, Louisiana. The waterway was constructed primarily to facilitate commercial traffic, but commercial traffic declined significantly after 1964. In 1975, the Corps discontinued maintenance dredging for several years and placed the project in limited operational status with reduced funding and maintenance. Subsequently, the project sponsor requested that tests be performed regarding the feasibility of reopening the project. The results indicated that dredging was needed, and the United States dredged to reopen the waterway to commercial traffic on two occasions in 1988 and 1989.

In 1991, an Environmental Impact Statement was performed to assess the potential harm of dredged materials. A final EIS issued in 1994, and environmental litigation seeking declaratory and injunctive relief against dredging the waterway was filed in January of 1995. On May 25, 1995, the United States District Court for the Eastern District of Louisiana issued a preliminary injunction against dredging in order to prevent irreparable harm to the ecosystem. The same year, Congress restricted dredging funds and placed the project in caretaker status. It allocated funds ($280,000.00) for maintenance of the project in caretaker status and correction of safety problems at the project locks.

In March of 1998, the parties to the injunction proceeding submitted a stipulated order of dismissal, ending the injunction. Thus, the Corps was enjoined from dredging the waterway from late May 1995 to March 1998. In April of 1998, Dunaway was injured when his motorboat hit a submerged sandbar in the canal. On July 10, 1998, Dunaway sued the United States, alleging that the United States was negligent in failing to mark, warn of or remove the sandbar. Dunaway thereafter amended his complaint to include the Sheriff of St. Tammany, Rodney Strain. Strain filed a cross-claim against the United States, alleging that the United States had a duty to maintain the canal and to warn of, mark, or remove obstructions such as the sandbar.

The United States now moves the Court to dismiss the case against it for lack of subject matter jurisdiction. The United States contends that the claims challenge discretionary conduct for which it has not waived sovereign immunity. The United States moves in the alternative for summary judgment on the same grounds.

## II. Discussion

The United States' motion shall be treated as one for summary judgment, because this Court has considered matters outside the pleadings.

### A. Summary Judgment Standard

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir.1990), *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one for which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554; *see also Lavespere*, 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

## B. Discretionary Function Exception to SAA

■■■ Generally, the United States is immune from suit unless it waives sovereign immunity. *See United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). The Federal Tort Claims Act ("FTCA") was enacted in order to allow persons to sue the United States for injury, but it is subject to various exceptions such as the discretionary function exception. *See* 28 U.S.C. § 2680.[2] The discretionary function exception provides:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute of regulation be valid, or based upon the exercise or performance *or the failure to exercise or perform* a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a), *emphasis added.* The exception thus eliminates any waiver of immunity from suit for acts that "involv[e] an element of judgment or choice[,]" which is grounded in economic, political or social policy. *United States v. Gaubert*, 499 U.S. 315, 322, 111 S.Ct. 1267, 1273, 113 L.Ed.2d 335 (1991), *quoting Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988). An inquiry into what falls under the discretionary function exception must focus on the nature of the act, rather than the status of the actor. *See United States v. Varig Airlines*, 467 U.S. 797, 813, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984). The requirement of judgment or choice is not satisfied, however, if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," because the employee has no choice but to follow the course of action. *Berkovitz*, 486 U.S. at 536, 108 S.Ct. at 1958–9.

■■■ The Court must therefore employ a two-step inquiry to determine whether conduct falls within the discretionary function exception. The Court determines (1) whether the challenged conduct involves an element of judgment or choice; and, (2) whether the judgment at issue is the kind the discretionary function exception was designed to shield, that is, whether it is grounded in social, economic or political public policy. *See id., Varig*, 467 U.S. at 813, 104 S.Ct. at 2764; *ALX El Dorado, Inc. v. Southwest Savings & Loan Ass'n.*, 36 F.3d 409, 411 (5th Cir.1994) (laying out judgment and policy prongs of discretionary function inquiry). When a governmental policy such as a statute, guideline, or regulation allows an agent to exercise discretion, courts may presume that the agent's acts are grounded in policy in the exercise of that discretion. *See Gaubert*, 499 U.S. at 324, 111 S.Ct. at 1274. On the other hand, courts may conclude that the failure to act, although discretion-

---

**2.** For a discussion of the legislative history surrounding the FTCA and the discretionary function exception, *see Dalehite v. United States*, 346 U.S. 15, 24–30, 73 S.Ct. 956, 962–65, 97 L.Ed. 1427 (1953).

ary, is not "susceptible" to the policy considerations requisite to invoke the shield of the discretionary function exception. *Id.* at 325, 111 S.Ct. at 1275. The discretionary function exception was confected to protect only those judgments based on public policy, because its purpose is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Varig,* 467 U.S. at 814, 104 S.Ct. at 2765; *see Berkovitz,* 486 U.S. at 537, 108 S.Ct. at 1959.

Although it is not expressly written into the Suits in Admiralty Act ("SAA"), 46 U.S.C.A. § 741, *et seq.,* under which this suit is filed, the Fifth Circuit has applied the discretionary function exception to the SAA. *See Baldassaro v. United States,* 64 F.3d 206, 208 (5th Cir.1995); *Wiggins v. United States,* 799 F.2d 962 (5th Cir.1986). Here, the relevant inquiry is whether the failure to act by the Corps of Engineers was protected by the discretionary function exception.

### 1. Element of Judgment or Choice

■ The Corps argues that the decision not to warn of, mark or remove the sandbar in the canal falls squarely within the discretionary function exception. The Corps enjoys wide latitude, it asserts, in deciding whether and how to deal with submerged obstructions such as the sandbar at issue.

The United States does not ensure the safe navigation of any waterway. *See Canadian Pacific Ltd. v. United States,* 534 F.2d 1165 (5th Cir.1976); *In re Lloyd's Leasing Ltd.,* 764 F.Supp. 1114, 1138 (S.D.Tex.1990). Further, the United States has no duty to establish aids to navigation. *See Indian Towing v. United States,* 350 U.S. 61, 69, 76 S.Ct. 122, 100

L.Ed. 48 (1955); *Tringali Bros. v. United States,* 630 F.2d 1089, 1090 (5th Cir. Unit A, 1980) (holding that although it is authorized to do so, Coast Guard has no statutory duty to place navigational aids in dangerous waterways).

■ Because the United States has no duty to ensure the safe navigation of any waterway, or to establish aids to navigation, it enjoys discretion as to whether and how it will establish such aids. *See Indian Towing,* 350 U.S. at 69, 76 S.Ct. 122; *Theriot v. United States,* 245 F.3d 388 (5th Cir.1998) [3] (holding that Corps was immune from liability for decision not to warn of or mark underwater sill it constructed decades before boating accident); *Picou v. United States,* 1995 WL 232674 at *2 (E.D.La. Apr. 17, 1995) (holding that United States has discretion to determine whether it will undertake duty to mark, remove or warn of an obstruction to navigation). Decisions involving whether and how to warn, mark or remove obstructions such as the sandbar necessarily require the exercise of judgment or choice in selecting the location, number, size, type and operational characteristics of maritime aids. *See Lawson v. United States,* 124 F.3d 198, 1997 WL 530540 at *3 (6th Cir. Aug. 27, 1997, (unpublished)) (holding that placement of navigational lights by its very nature requires judgment and discretion).

It is true that the discretionary function exception does not apply if the Corps (or its employee) failed to follow a specific, mandatory directive. *See Berkovitz,* 486 U.S. at 531, 108 S.Ct. at 1958. Dunaway and Strain fail, however, to point to any mandatory regulations governing the Corps' marking or removal of sandbars.

---

**3.** *Theriot* is an unpublished opinion with limited precedential value pursuant to 5th Cir.R.

47.5.4. Under this rule, however, unpublished opinions may be persuasive.

## (a) Congressional Authority and Conference Report

Strain submits that the Corps failed to maintain a channel of 7 feet deep by 80 to 100 feet wide "as Congress originally required." (Strain's Mot. Opp'n. at 5.) This assertion ignores the fact that beginning in 1995, and for several years, the Corps was specifically enjoined from dredging the canal. In addition, despite any original authorization by Congress, Congress placed the waterway in caretaker status in 1995, at which time it allocated a fixed sum of money ($280,.000.00) with which the Corps was charged to do maintenance and correct safety problems at the project's locks. (*See* Pl.'s Opp'n. Ex. 9 (Conference Report 104–293).) The Conference Report lists no specific course of action, priority, or definition of "maintenance" or "safety problems." That the Corps was enjoined from dredging for three years before this accident, and that it had a limited budget (and no statutory directives) with which to do maintenance and make safety corrections to the project evidence the necessity of judgment and choice in making these decisions. *Cf. Lincoln v. Vigil*, 508 U.S. 182, 183, 113 S.Ct. 2024, 2026, 124 L.Ed.2d 101 (1993) ("when Congress merely appropriates lump-sum amounts without statutory restriction, clear inference may be drawn that it does not intend to impose legally binding restrictions [on their use], and indicia in committee reports ... [indicating] how the funds should, or are expected to[ ] be spent do not establish any legal requirements on the [federal] agency"); *Sea-Beam Instruments, Inc.*, 1992 WL 175870 (C.G.) (Jul. 20, 1992) (same). Furthermore, Chapter 8 of ER 1130–20–520 provides that "authorized navigation projects will be maintained to full ... channel dimensions when feasible and justified," and the justification must reflect the current level of navigational activity and budgetary constraints. ER 1130–2–520 § 8–2(a)(2)(5). The Corps' decision whether

maintenance of the original channel dimensions was "feasible and justified" clearly involves judgment, the essence of discretion.

In *Theriot, supra*, the Fifth Circuit rejected a similar argument by plaintiffs who were injured while fishing in the Mississippi River. The plaintiffs' boat struck a sill that the Corps had constructed in 1959, which was originally tied into the banks by earthen levees that were visible above water. Subsequently, the entire sill became submerged as a result of erosion, but the Corps decided not to mark or warn of the obstruction. The injured parties in *Theriot* alleged that the Corps failed to maintain the sill in its original condition and that this conduct was unprotected by the discretionary function exception. *See id.* at *7. In support of their argument, the appellants in *Theriot* cited *Indian Towing, supra; Denham v. United States*, 834 F.2d 518, 520–21 (5th Cir.1987) (holding that decision to establish recreational swimming area was discretionary, but failure to replace buoy that had been secured by anchor was outside protection of discretionary function exception); *Sheridan Transportation Co. v. United States*, 834 F.2d 467, 473 (5th Cir.1987) (recognizing that initial decision to place buoy 60 feet from wreck was discretionary function, but moving buoy 250 away from wreck without warning the public was not protected by discretionary function exception). The Fifth Circuit distinguished these cases and rejected this argument. See *Theriot, supra*, at **8–9. It held that the cases cited by the appellants involved the government's failure to *maintain certain navigational aids* it had installed, such as lighthouses and buoys, not its failure to maintain structures it owned or constructed such as the sill. *See id.* The court concluded that a different result would issue had the Corps first decided to physically mark the location of the sill, and

then negligently carried out that decision. *See id.* Here, as in *Theriot*, the Corps never marked the sandbar at issue. Had it undertaken to warn of the obstruction, and then negligently carried out this decision, cases such as *Indian Towing, Denham,* and *Sheridan* would guide the result. This is not the case, however. Furthermore, the sandbar was not constructed by the Corps. Strain argues that the Corps nevertheless created the sandbar, because it arose only when the Corps created the canal. Even if the Court accepted this argument, it would still find that the discretionary function exception applies because the Fifth Circuit has found that the exception applies even when the Corps has intentionally constructed the obstruction. *See Theriot, supra.*

### (b) ER 1130-2-520

Strain contends that the Corps had a nondiscretionary duty to warn the public and to notify the Coast Guard of the sandbar under ER 1130-2-520. This regulation, entitled "Aids to Navigation, Navigation Charts, and Related Data," states:

Applicable elements shall cooperate in the communication of navigation-related information of specific interest to the recreational and commercial marine industries, user and other related government entities. [ . . . ]

*MSC/district commanders* shall furnish to the U.S. Coast Guard (USCG) district commanders, for their immediate information, any facts which may come to their attention in connection with their duties which shall be of benefit to the USCG *in maintaining its system of aids to navigation.* [ . . . ]

ER 1130-2-520, *emphasis added to show language omitted by Strain.* Neither paragraph establishes a fixed standard mandating that the Corps issue public warnings about sandbars. The first paragraph is merely a directive to "[a]pplicable elements" to cooperate. The second paragraph refers to "*maintaining* [the Coast Guard's] system of aids to navigation[,]" which suggests that this regulation deals with *existing* navigational aids and charts. Furthermore, the words "which shall be of benefit to the USCG" in the second paragraph require judgment in deciding what information to report. Finally, for Strain's argument to matter, he would have to show that the Coast Guard, if notified, would have had a duty to mark or remove the sandbar. Strain has established no such duty.

### (c) Memorandum of Agreement

Strain also argues that a Memorandum of Agreement ("MOA") between the Corps and the USCG established a nondiscretionary duty on the Corps to report possible hazards to the Coast Guard. This internal regulation provides guidelines as to which agency does what in assessing an obstruction. It establishes a range of possible actions to take and a nonexclusive list of factors to consider in deciding what to do about an obstruction. *See* Strain's Opp'n. Ex. D at B. The Corps correctly points out that reliance on an identical MOA was rejected in *Theriot. See Theriot, supra* at *11.

In *Theriot*, the Fifth Circuit concluded that the MOA applied only to privately owned structures. *See id.* The MOA contained "[n]umerous references to the 'owner' of an obstruction or a sunken vessel." *Id.* For example, the MOA referred to the Coast Guard's authority to mark obstructions if the owner cannot be identified or fails to adequately mark the obstruction. *Id.* at *14. The Court therefore concluded that the "logical reading is that the referenced owner is a private third party other than the Corps, the Coast Guard, or any other government agency." *Id.*

The Fifth Circuit also reasoned that even if the MOA applied to the govern-

ment-owned sill, the MOA did not mandate any specific corrective action. Rather, the MOA lists nonexclusive factors to consider in determining whether an obstruction is a hazard to navigation and in determining what to do about it if it is. *See id.* at **13–14. The decision whether an obstruction is a hazard to navigation involves the use of the agencies' collective judgment in considering the factors listed.[4] Once the Corps and the Coast Guard decide that an object is a hazard to navigation, the MOA lists alternative courses of action that they may follow, which include doing nothing. These alternatives are: (1) no action; (2) charting; (3) broadcasting and publication of navigational safety information; (4) marking; (5) redefinition of navigational area; (6) removal; and (7) combination of above. Thus, even if the Corps had reported the sandbar to the Coast Guard, the MOA did not impose a nondiscretionary duty on either the Corps or the Coast Guard to mark or remove the sandbar.

### (d) 36 C.F.R. § 327.1

Even less persuasive is Strain's contention that 36 C.F.R. § 327.1 prescribes specific behavior with which the Corps' employee failed to comply. This regulation merely states that it is the Corps' policy to "manage the natural, cultural, and developed resources of each project in the pub-

lic interest, providing the public with safe and healthful recreational opportunities ..." 36 C.F.R. § 327.1. Strain points to nothing indicating that this regulation applies to the waterway at issue, and the language of the regulation is devoid of specific directives prescribing the behavior of the Corps or its employees. *See, e.g., Baum v. United States,* 986 F.2d 716, 722 (4th Cir.1993) (holding that language requiring agency to provide a safe approach for passenger-vehicle traffic cannot be interpreted as a mandatory directive under *Gaubert or Berkovitz,* and did not remove all safety-related decisions from agency's discretion).

### (e) 36 C.F.R. § 330.5(a)

Dunaway similarly contends that 36 C.F.R. § 330.5(a) prescribes a course of action for the Corps and its lock and dam operator, Kenneth Parker. This section states that "[i]t is the policy of the Corps to provide, to the extent of its authorities, a safe and healthful environment for public use of lands and waters at Civil Works water resource development projects." 36 C.F.R. § 330.5(a). This section deals with "Regulation of Law Enforcement Services Contracts at Civil Works Water Resource Projects Administered by the Corps of Engineers" and does not address any Corps policy regarding how to deal with sandbars. *See* 36 C.F.R. § 330. Rather,

---

4. Those factors are:

(1) Degree to which obstruction restricts, endangers, or interferes with the navigability of a body of water.

 (a) Location with respect to navigational traffic patterns.

 (b) Navigational difficulty at site of obstruction.

 (c) Clearance of depth of water over obstruction.

 (d) Fluctuation of water level and other hydraulic characteristics.

(2) Physical characteristics of obstruction, including cargo (if any).

(3) Possible movement of obstruction.

(4) Marine activity in vicinity of obstruction.

 (a) Type of commercial and recreational vessel traffic.

 (b) Density of commercial and recreational vessel traffic.

 (c) Trends of waterway use.

(5) Location of obstruction with respect to existing aids to navigation.

(6) Prevailing and historical weather conditions.

(7) Length of time obstruction has existed.

(8) History of vessel accidents involving obstruction.

(Strain's Mot. Opp'n. Ex. D at B–4.)

it deals with contracts for law enforcement services, and the canal project at issue is devoid of such a contract. Even if § 330 did apply to the canal project, the language "to the extent of its authorities" indicates that the Corps must exercise judgment in carrying out the policy expressed in the regulation.

### (f) 33 C.F.R. § 245

Along the same lines, Dunaway cites 33 C.F.R. § 245, entitled "Removal of Wrecks and Other Obstructions." This describes the Corps' authority for "wreck removal." 33 C.F.R. § 245.1. This authority is limited by ER and EP 1130–2–520, which specifically state that they do not apply to obstructions other than vessels.[5] Moreover, even if § 245 applied to sandbars, it does not establish mandatory corrective action. *See* 33 C.F.R. § 245.25 (listing marking, removal, or redefinition of a waterway as examples of action that may be considered).

### (g) EP 1130–2–550

Dunaway also asserts that EP 1130–2–550 prescribes a specific course of action which the Corps violated. This policy provides that the "Corps integrates management of diverse natural resource components such as fish, wildlife, forests, wetlands, grasslands, soil, air and water with the provision of public recreation opportunities. The Corps conserves natural resources and provides recreation opportunities that contribute to the quality of American life." EP 1130–2–550. A stated objective of this policy is to provide "a quality outdoor recreation experience which includes an amenable, safe and healthful environment." *Id.* Although the Corps disputes whether this policy

even applies to the project at issue, the Court finds that even if it does, there is nothing in this general policy statement that prescribes a mandatory course of action with respect to marking sandbars.

### (h) Parker's Knowledge and Job Description

Strain also argues that there is a material issue of fact as to whether the Corps' employee Kenneth Parker knew of the sandbar prior to plaintiff's accident. An analysis of prior knowledge, however, is unhelpful in the present case, because the Fifth Circuit has found that the Corps' acts or omissions may be protected even when it created and knew of the obstruction. *See, e.g., Wiggins,* 799 F.2d at 963 (explaining that Coast Guard and Corps knew of pilings in lake involved in accident, and holding agency decision that use of government funds to remove them was unjustifiable was protected by discretionary function exception); *Theriot, supra* (holding that United States was immune from suit regarding collision with sill constructed by government); *cf. Mestayer v. United States,* 1995 WL 405711 at *4 (E.D.La. Jul. 7, 1995) (holding that United States' failure to light warning signs at night on sill it constructed fell within discretionary function exception).

Dunaway and Strain aver that Parker's job description amounts to a mandatory directive that removes his conduct from the ambit of the discretionary function exception. Parker, they assert, had no discretion in the performance of his duties; thus his failure to notify the Corps and the USCG so that they might determine whether and how to respond to the sandbar is unprotected behavior.

---

**5.** Under ER 1130–2–520, *Navigation and Dredging Operations and Maintenance Policies,* the Corps' authority to remove wrecks or other obstructions is limited to removal of vessels, and does not "includ[e] objects such as trucks, train cars, boulders, or debris." ER 1130–2–520 at ¶¶ 4–2, 4–3(b). *See also* EP 1130–2–520 at ¶ 4–2.

The Court observes first that an internal government job description does not have the force of a statute or a regulation. The Court doubts that Parker's internal job description can, without more, establish an actionable duty to the public or remove discretion from his employing agency over matters otherwise committed to it. *See Zabala Clemente v. United States*, 567 F.2d 1140, 1145 (1st Cir.1977) (even assuming FAA surveillance order was mandatory, it did not give rise to legal obligation under FTCA, because employee's duty to comply with directive is different from duty owed by government to public);[6] *cf. In re American Oil Co.*, 417 F.2d 164, 170 (5th Cir.1969) (USCGs' search and rescue plan imposed no duty on the government to public); *Tringali*, 630 F.2d at 1093 (failure to live up to internal regulations did not amount to negligence *per se*).

Furthermore, Parker's job description does not establish nondiscretionary duties with respect to the sandbar. His duties included:

> furnishing information to public on project resources and facilities ... conducting water patrols and inspections of the lateral canal which connects the locks and dams to determine channel maintenance requirements such as snagging and removal of drift accumulation ... monitors project signs and navigation aids, taking appropriate action to insure replacement of damaged or destroyed signs and buoys.

(Pl.'s Mot. Opp'n. Ex. Norris 4 at 1–2.) The description confers considerable discretion on Parker because he

> determines priority of work to be accomplished at the facilities ... [u]ses judgment in paying particular attention to areas, activities, or time/day situations that are likely problem periods or sources ... [and][i]ndependently plans and accomplishes work in accordance with general directives.

(*Id.* at 1–3.) Parker's job description merely outlines his major responsibilities, and the day-to-day decisions involved in carrying out these duties requires the exercise of judgment or choice. Parker's duties, including conducting water patrols and inspections of the canal, nowhere prescribe the frequency, location, or method of inspection. Nor do his duties authorize him to initiate dredging. Further, Parker's job duties do not involve deciding where to place new navigation aids or markers; rather, he is charged only with maintaining *existing* signs and buoys. In short, Parker's job description is insufficient to nullify the applicability of the discretionary function exception. The Corps retains discretion as to whether, when and in what manner to deal with an obstruction

---

**6.** *Zabala* did not discuss the discretionary function exception, and courts have not directly addressed the issue of whether an internal job description, if mandatory, can have sufficient force to remove challenged activity from the ambit of an agency's discretion. Like *Zabala*, a number of courts have jumped to the bottom line issue of whether a tort duty exists and have held that mandatory internal regulations or administrative directives, while undisputably binding on government personnel, fail to create actionable duties to accident victims. *See, e.g., Tiffany v. United States*, 931 F.2d 271, 280 (4th Cir.1991) (rejecting plaintiff's argument that mandatory internal directive created duty to civilians killed in air crash), *citing Zabala, supra, and In re Korean Air Lines Disaster of September 1, 1983*, 646 F.Supp. 30 (D.D.C.1986). The *Tiffany* court reasoned that holding otherwise "could only result in increased confusion and a loss of ... efficiency" and that no "worthwhile goals" would be achieved "if [the agency] were to state in boilerplate throughout its regulations that the rules are not meant to create tort duties, or if [the agency] responded by promulgating regulations of a most permissive nature, designed to retain maximal flexibility." *Tiffany*, 931 F.2d at 281.

such as a sandbar. *Cf. Canadian Pacific,* 534 F.2d at 1170 (holding that Corps is under no duty to survey or dredge river in any particular time or place).

In summary, an analysis of the Conference Report, regulations, MOA, and Parker's job description reveals that the failure to report, warn of, mark, or remove the sandbar is shielded by the discretionary function exception.

### 2. Grounded In Policy

The discretionary decision concerning the handling of sandbars is susceptible to social and economic policy considerations, including the needs of society and maritime commerce, and the efficient use of federal funds. As the Corps notes, the decision to mark the sandbar, dredge the canal, or do nothing involves considerations of the amount of commercial traffic on the waterway relative to the potential expense of dealing with the sandbar. Further, undertaking to mark the sandbar would involve costs and would expose the United States to further liability under the "failure to maintain" or "supplied a service" arguments that have prevailed in discretionary function cases. *See, e.g., Indian Towing, supra.*

 Courts in this circuit and others have found that the United States has satisfied both prongs of the discretionary function exception inquiry on similar facts. *See Theriot, supra* (affirming lower court's holding that decision whether to warn requires exercise of policy judgment); *Mestayer,* 1995 WL 405711 at *4 (holding that decisions concerning the installation of warning devices are covered by the discretionary function exception); *Kiehn v. United States,* 984 F.2d 1100, 1103 (10th Cir.1993) (holding that whether to post warning signs is clearly discretionary); *Bowman v. United States,* 848 F.Supp. 979, 986 (M.D.Fla.1994) (stating that decision not to warn of government-created

hazard fell within discretionary function exception). Any failure by the Corps or its employee to report, warn of, mark, or remove the sandbar is thus susceptible to policy analysis and satisfies the second prong of the discretionary function inquiry.

### III. Conclusion

For the foregoing reasons, the United States' motion for summary judgment is granted.