Cassandra **FLANIGAN**, as widow and next friend of William Timothy **FLANIGAN**, deceased, Plaintiff,

v.

**WESTWIND TECHNOLOGIES, INC.; Westar Aerospace & Defense Group, Inc.; Honeywell International, Inc.; McDonnell Douglas Helicopter Company; and Boeing Company, Defendants.**

No. 07–1124.

United States District Court,
W.D. Tennessee,
Eastern Division.

Sept. 15, 2008.

Galen D. Bauer, Robert T. Spohrer, Spohrer & Dodd, PL, Jacksonville, FL, Jeffrey S. Rosenblum, Rosenblum & Reisman, Memphis, TN, Edward Royce Curtis, Tripp Scott, P.A., Fort Lauderdale, FL, for Plaintiff.

James W. Huston, Joanna E. Herman, William V. O'Connor, Morrison & Foerster, LLP, San Diego, CA, Tricia T. Olson, Brian S. Faughnan, Cannon F. Allen, Adams and Reese, LLP, Memphis, TN, John Randolph Bibb, Jr., Robert F. Chapski, Waller Lansden Dortch & Davis, LLP, Gary C. Shockley, Marneea L. Baker, Baker Donelson Bearman Caldwell & Berkowitz, Nashville, TN, Beth Marie Strosky, Kelly F. Moser, Steven S. Bell, Todd W. Rosencrans, Perkins Coie LLP, Seattle, WA, for Defendants.

## ORDER GRANTING MOTIONS OF DEFENDANTS HONEYWELL INTERNATIONAL, INC., McDONNELL DOUGLAS HELICOPTER COMPANY, BOEING COMPANY AND WESTAR AEROSPACE & DEFENSE GROUP, INC. TO DISMISS

J. DANIEL BREEN, District Judge.

### INTRODUCTION AND PROCEDURAL BACKGROUND

This lawsuit, filed June 29, 2007, arose out of the death of William Timothy Flanigan ("Flanigan") on July 2, 2006 while piloting an AH–64 Apache Helicopter (sometimes referred to herein as "the Apache") near Kandahar, Afghanistan. The original complaint named as Defendants Westwind Technologies, Inc.; Honeywell International, Inc. ("Honeywell"); McDonnell Douglas Helicopter Company ("MDHC"); and The Boeing Company ("Boeing"), and alleged claims for product liability, breach of contract, breach of warranties and loss of consortium. On September 4, 2007, Honeywell moved to dismiss the complaint, contending that dismissal was appropriate pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Docket Entry ("D.E.") # 11.) The motion was joined by MDHC and Boeing. (D.E.# 12.) On De-

cember 7, 2007, the Plaintiff, Cassandra Flanigan, as widow and next friend of William Timothy Flanigan, deceased, filed an amended complaint, adding Westar Aerospace & Defense Group, Inc. ("Westar") as a Defendant. (D.E.# 39.) On January 4, 2008, Honeywell sought permission from the Court to supplement its motion to include a request for dismissal in accordance with Rule 12(b)(1), Fed.R.Civ.P., which is hereby GRANTED. (D.E.# 41.) A motion to dismiss was filed on behalf of Westar on January 7, 2008, wherein it incorporated by reference the motion to dismiss filed by Honeywell. (D.E.# 42.) As responses and replies have been submitted, the issue is now ripe for disposition.

### FACTS ALLEGED

According to the First Amended Complaint, Flanigan died because the Apache, along with its component parts, including the helmet worn by the decedent, were defective. (First Am. Compl. at ¶ 11.) All of the Defendants had entered into contracts with the United States Army for the purchase and/or maintenance of the Apache. (First Am. Compl. at ¶ 36.) The aircraft was designed and manufactured by MDHC, which was later acquired by Boeing. (First Am. Compl. at ¶¶ 12–13.) It was equipped with an Inter–Communication System and Sight Electronics Cable that allowed the pilot and co-pilot gunner to communicate via a voice-activated system integrated through their helmets. (First Am. Compl. at ¶ 14.) The system also provided the pilot and co-pilot with visual references from various imaging systems on the helmet's shield. It was activated through cords and/or cables that plugged directly into the helmets. (First Am. Compl. at ¶ 14.) The cords were connected to plugs located behind the pilot and co-pilot and, in the event they became disconnected in flight, the pilot and co-pilot were required to unbuckle their shoulder harnesses in order to reconnect them.

(First Am. Compl. at ¶ 14.) If the cords were disconnected in flight, the pilot would not be able to utilize the instrumentation and night vision features on the helmet's shield or to communicate with anyone inside or outside the Apache. (First Am. Compl. at ¶¶ 15, 17.)

The helmet and its integrated systems were manufactured by Honeywell, Boeing or Westwind. According to the Plaintiff, it failed to meet the specifications of and was not approved by the United States Army. (First Am. Compl. at ¶ 15.) The cords were manufactured or chosen for use on the Apache by Westwind, Westar, Honeywell, MDHC or Boeing. (First Am. Compl. at ¶ 16.)

Westwind has a contractual relationship with the United States Army to serve as program manager for the AH–64 Apache Helicopter at the McKellar Airfield in Jackson, Tennessee and other locations in the United States as well as in Kandahar, Afghanistan. (First Am. Compl. at ¶ 6.) Westar serves as a support contractor and/or program manager for the Apache. (First Am. Compl. at ¶ 7.)

An Article 15–6 investigation (the "Investigation") was conducted by the United States Army, in which it was found that, within minutes of departure and within five kilometers of the Kandahar Airfield, the Apache carrying Flanigan crashed without warning, impacting the ground at a speed of approximately 120 knots. The craft skipped once and struck the ground a second time about fifty meters from the first touchdown point. Flanigan died of multiple blunt force injuries. The co-pilot was only slightly hurt. (First Am. Compl. at ¶¶ 18, 19.) According to the Investigation, Flanigan's cords became disconnected shortly after departure, forcing him to undo his seatbelt, let go of the controls and physically reconnect the cords. (First Am. Compl. at ¶ 20.) Before Flanigan could

return to his seat, the Apache crashed, killing him. (First Am. Compl. at ¶ 20.)

It is the Plaintiff's assertion that the cords disconnected because they were too short and that the Defendants were aware of the problem. (First Am. Compl. at ¶ 21.) The Investigation revealed that "[t]he cables have a tendency to become unplugged during flight based on the movement of the pilots." (First Am. Compl. at ¶ 21.) It was also indicated that the cord problems were exacerbated by the bulky air warrior aviation life support vest and body armor worn by aircrew members. Moreover, the Plaintiff avers that the method by which the cords were connected was defective. (First Am. Compl. at ¶ 22.) The Investigation concluded that, when faced with the necessity of reconnecting the cords, "perhaps most importantly, the pilot on the controls who is flying the aircraft is unable to communicate to the other pilot to take the controls and fly the aircraft." (First Am. Compl. at ¶ 23.)

It has been alleged that other pilots had complained to agents and employees of Westwind and/or Westar prior to Flanigan's deployment to Afghanistan concerning problems with the cords. Some of these complaints had been made to Westwind and/or Westar at McKellar Airfield in Jackson, Tennessee. Notwithstanding the complaints, no action was taken by these Defendants to correct the problem. (First Am. Compl. at ¶ 24.) Immediately after Flanigan's death, longer cords were provided to Apache pilots. (First Am. Compl. at ¶ 25.)

The complaint contends that MDHC and Boeing, which manufactured the Apache, and Honeywell, the helmet manufacturer, were negligent in not providing a proper mechanism for reconnecting the cords or a method by which the pilot and co-pilot could communicate in the event the cords became disconnected. The Plaintiff fur-

ther complains that these Defendants were negligent for failing to specify or provide cords of a proper length or to suggest or design a wireless helmet. (First Am. Compl. at ¶¶ 28, 31, 33.) With respect to Westwind and/or Westar, it is charged that these Defendants were negligent in not insuring the cords were long enough for their intended purpose and to develop a safe procedure for reconnecting the cords in flight. (First Am. Compl. at ¶ 34.)

## STANDARD OF REVIEW

Fed.R.Civ.P. 12(b)(1) allows for dismissal of a complaint for "lack of subject-matter jurisdiction." "Subject matter jurisdiction is always a threshold determination." *Am. Telecom Co., L.L.C. v. Republic of Lebanon,* 501 F.3d 534, 537 (6th Cir.2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 1472, 170 L.Ed.2d 296 (2008). "A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction may involve a facial attack or a factual attack. When a Rule 12(b)(1) motion attacks the factual basis of jurisdiction, the district court must weigh the evidence and the plaintiff has the burden of proving that the court has jurisdiction over the subject matter." *Id.* (internal citations omitted).

Rule 12(b)(6) permits the Court to dismiss a complaint for failure to state a claim upon which relief may be granted. "Factual allegations contained in a complaint must raise a right to relief above the speculative level." *Bassett v. Nat'l Collegiate Athletic Ass'n,* 528 F.3d 426, 430 (6th Cir.2008) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)) (internal quotation marks omitted). Heightened fact pleading of specifics is not required; rather, a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." *Id.* (citing *Twombly,* 127 S.Ct. at 1974). "In reviewing a

motion to dismiss, [the court] construe[s] the complaint in the light most favorable to the plaintiff, accept[s][her] allegations as true, and draw[s] all reasonable inferences in favor of the plaintiff." *Id.* (citation omitted).

## ANALYSIS OF THE PARTIES' CLAIMS

It is the position of the Defendants that dismissal of this action is appropriate as it involves nonjusticiable political questions and is preempted by the "combatant activities" exception to the Federal Tort Claims Act (the "FTCA").

*Political Question Doctrine.*

"The political question doctrine is founded upon the long-standing recognition that certain actions of the Government are committed to its political branches." *People of Bikini, ex rel. Kili/Bikini/Ejit Local Gov't Council v. United States,* 77 Fed.Cl. 744, 781 (Fed.Cl.2007), *app. filed* (Sept. 28, 2007). Its purpose "is to bar claims that have the potential to undermine the separation-of-powers design of our federal government." *Lane v. Halliburton,* 529 F.3d 548, 559 (5th Cir.2008). Thus,

[q]uestions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in [the courts]. This "political question" doctrine reflects the principle that, under our Constitution, there are some questions that cannot be answered by the judicial branch. Out of due respect for our coordinate branches and recognizing that a court is incompetent to make a final resolution of certain matters, these political questions are deemed "nonjusticiable." A declination of jurisdiction under the doctrine presupposes that another branch of government is both capable of and better suited for resolving the "political" question. Political questions are labeled "nonjusticiable" because there is an undeniable

difference between finding no federal jurisdiction at the outset of a case and declaring that a particular matter is inappropriate for judicial resolution only after some consideration of the merits.

*Id.* at 557 (internal citations and quotation marks omitted).

In the seminal case of *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the United States Supreme Court articulated that "[i]n the instance of nonjusticiability, consideration of the cause is not wholly and immediately foreclosed; rather, the [c]ourt's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." *Baker,* 369 U.S. at 198, 82 S.Ct. at 700. "The *Baker* analysis is not satisfied by 'semantic cataloguing' of a particular matter as one implicating 'foreign policy' or 'national security.' Instead, *Baker* demands a 'discriminating inquiry into the precise facts and posture of the particular case' before a court may withhold its own constitutional power to resolve cases and controversies." *Lane,* 529 F.3d at 558 (citing *Baker,* 369 U.S. at 216, 82 S.Ct. 691). In order to guide courts in making their "discriminating inquiry" into whether a particular case raises a political question, the *Baker* Court identified certain factors to be considered, to wit:

(1) a textually demonstrable constitutional commitment of the issue to a coordinate political department;

(2) a lack of judicially discoverable and manageable standards for resolving it;

(3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;

(4) the impossibility of a court's undertaking independent resolution without

expressing lack of the respect due coordinate branches of government;

(5) an unusual need for unquestioning adherence to a political decision already made;

(6) or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* (citing *Baker,* 369 U.S. at 217, 82 S.Ct. 691); *see also McMahon v. Presidential Airways, Inc.* 502 F.3d 1331, 1357–58 (11th Cir.2007), *reh'g and reh'g en banc denied,* 255 Fed.Appx. 504 (11th Cir.2007); *Bredesen v. Rumsfeld,* 500 F.Supp.2d 752, 762–63 (M.D.Tenn.2007). "A case may be dismissed on political question grounds if—and only if—the case will require the court to decide a question possessing one of these six characteristics." *McMahon,* 502 F.3d at 1358. The existence of any one factor will render the case "nonjusticiable" under the Article III "case or controversy" requirement. *Lane,* 529 F.3d at 558. The factors "are probably listed in descending order of both importance and certainty." *Vieth v. Jubelirer,* 541 U.S. 267, 278, 124 S.Ct. 1769, 1776, 158 L.Ed.2d 546 (2004).

"In determining if a political question exists, the court analyzes the claim 'as it would be tried, to determine whether a political question will emerge.'" *Smith v. Halliburton Co.,* No. H–06–0462, 2006 WL 1342823, at *2 (S.D.Tex. May 16, 2006) (quoting *Occidental of Umm Al Qaywayn, Inc. v. A Certain Cargo of Petroleum,* 577 F.2d 1196, 1202 (5th Cir.1978)). "Foreign policy and military affairs figure prominently among the areas in which the political question doctrine has been implicated." *Aktepe v. United States,* 105 F.3d 1400, 1403 (11th Cir.1997), *cert. denied,* 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). As the Eleventh Circuit observed in *McMahon,* however, "it is clear that not even military judgments are completely immune from judicial review.... Accordingly, [the court] must apply the *Baker*

factors to determine whether the suit ... will require the [court] to reexamine a military judgment; and if so, whether the military judgment is the kind that warrants application of the political question doctrine." *McMahon,* 502 F.3d at 1358 (internal citations omitted).

■ In assessing the first *Baker* factor—whether there is a textually demonstrable constitutional commitment of the issue to a coordinate political department—*Lane* is instructive. In that case, the United States Army awarded a contract under its Logistics Civil Augmentation Program to Halliburton, Kellogg Brown & Root, Inc. and various subsidiaries (collectively, "KBR") to provide logistical support services to military forces operating in Iraq. *Lane,* 529 F.3d at 554. In order to fulfill its obligations under the contract, KBR hired civilian truck drivers in the United States to work in Iraq, promising that they would not be sent into war zones. *Id.* at 554–55. After several drivers were killed in insurgent attacks, suits were brought based on theories of fraud, intentional infliction of emotional distress, negligence and wrongful death. *Id.* at 555.

The district court dismissed certain claims under the political question doctrine, finding, among other things, that they "involved a textual constitutional commitment to a coordinate political branch of government because resolution of those claims would require the court to review the Executive's conduct of military matters in Iraq." *Id.* at 555–56. The trial court considered it of particular importance that the relevant Army regulations stated that "the military must assess the risk of any mission and determine whether contractor support is suitable in certain situations and locations" and that the "assessment must consider 'the safety of contractor personnel.'" *Id.* at 554, 556. Moreover, the

Army Field Manual made "clear that the military [was] responsible for providing adequate force protection and a safe workplace for contractors and their employees who are performing support services overseas." *Id.* The provisions of the KBR contract "ma[d]e the responsibility of the military explicit to provide security-related intelligence gathering and force protection for KBR convoys in Iraq." *Id.* The district court concluded that it "could not try a case on a battlefield during war-time without an impermissible intrusion into powers expressly granted to the Executive by the Constitution." *Id.* at 556.

On appeal, the Fifth Circuit disagreed, explaining that

> [e]xamples of cases that implicate a textual commitment of constitutional authority to the Executive Branch include a challenge to the President's decision to deploy troops to a foreign land, or mine the harbors of another country in the course of a war against that country; so too has such a textual commitment been involved when a suit seeks judicial oversight of training procedures employed by the National Guard, requests in injunction of all nuclear testing, or requires the resolution of a territorial dispute between foreign sovereigns. These are matters that the President is constitutionally privileged to address.

*Id.* at 560 (internal citations omitted).

The court noted that the first *Baker* factor's "formulation is primarily concerned with direct challenges to actions taken by a coordinate branch of the federal government." *Id.* It recognized that

KBR was not part of a coordinate branch of the United States Government. Therefore, "[t]o invoke [the first *Baker* factor], KBR [was required to] face[ ] a double burden. First, [it had to] demonstrate that the claims against it [would] require reexamination of a decision *by the military*. Then, it must demonstrate that the military decision at issue [was] insulated from judicial review." *Id.* (citing *McMahon,* 502 F.3d at 1359–60) (internal quotation marks omitted) (emphasis in original).[1] Upon review, the *Lane* court concluded that

> [c]ontrary to the situations regarding matters of war, there is no textual commitment to the coordinate branches of the authority to adjudicate the merits of the [p]laintiffs' claims against KBR for breach of its duties. In fact, when faced with an "ordinary tort suit," the textual commitment factor actually weighs in favor of resolution by the judiciary. It is an extraordinary occasion, indeed, when the political branches delve into matters of tort-based compensation. Viewing the facts in a light most favorable to the [p]laintiffs, their claims challenge actions taken and omissions made only by KBR. That company's conduct can be examined by a federal court without violating the Constitution's separation of powers.

*Id.* (internal citations omitted).

In this case, as in *Lane,* the Plaintiff seeks essentially tort-based compensation based on actions taken solely by the Defendants, all of which are defense contractors in the same position as KBR.[2] Thus,

---

1. Indeed, the *McMahon* court noted that no court of appeals had upheld the dismissal of a suit against a private military contractor on political question grounds, although some district courts have done so. *McMahon,* 502 F.3d at 1358 n. 26.

2. Although the Defendants argue in their motion that this case would require an evalua-

tion of Army flight training, emergency flight procedures and proper conduct of a flight in combat in order to determine whether proper procedures were followed during the fatal flight, a review of the complaint as amended does not appear to implicate any of these issues. That is, it does not seek to assign blame for Flanigan's death to any inadequacies in Army training or flight procedures.

the Court finds that here too the first *Baker* factor weighs in favor of judicial resolution.

The second *Baker* consideration does not appear to be present here. "A political question looms menacingly when a claim suffers from 'a lack of judicially discoverable and manageable standards for resolving it.'" *Id.* (quoting *Baker*, 369 U.S. at 217, 82 S.Ct. 691). Courts have often concluded that "certain military judgments are outside the competence of courts." *McMahon*, 502 F.3d at 1363. "[I]t is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, unsuitable for judicial resolution." *Id.* (quoting *Gilligan v. Morgan,* 413 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973)). "[S]election of the appropriate design for military equipment to be used by our Armed Forces ... involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness." *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 88 (2d Cir.2008) (quoting *Boyle v. United Tech. Corp.*, 487 U.S. 500, 511, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988)).

In *Aktepe*, the Eleventh Circuit, finding that no judicially discoverable and manageable standards existed for resolving issues arising from the deaths of Turkish soldiers during NATO exercises in which armed missiles were accidentally used by American forces, stated that

> [i]n order to determine whether the Navy conducted the missile firing drill in a negligent manner, a court would have to determine how a reasonable military force would have conducted the drill.... Courts will often be without knowledge of the facts or standards necessary to assess the wisdom of the balance struck [between safety and greater combat effectiveness]. More particularly, courts lack standards with which to assess whether reasonable care was taken to achieve military objectives while minimizing injury and loss of life.

*Aktepe*, 105 F.3d at 1404 (internal citations omitted). The Fourth Circuit reached a similar conclusion in *Tiffany v. United States*, 931 F.2d 271 (4th Cir.1991), *cert. denied*, 502 U.S. 1030, 112 S.Ct. 867, 116 L.Ed.2d 773 (1992), finding that a negligence action by the estate of a civilian pilot intercepted by military aircraft on the authority of the North American Air Defense Command (NORAD)[3] lay outside the province of the courts. Specifically, the court held that

> [c]ourts cannot impose their own concept of "the prudent intercept" on NORAD. Judges have no "judicially discoverable and manageable standards for resolving" whether necessities of national defense outweigh risks to civilian aircraft. Nor can we even undertake independent resolution without expressing lack of the respect due coordinate branches of government. Any judgment we might render would lay upon NO-

---

**3.** NORAD, an agent of the Department of Defense, "is a joint military command composed of American and Canadian forces which have the responsibility for maintaining the aerial defense of the North American continent. Its peacetime mission is to detect and identify any unusual air activity within the perimeter areas of the North American Conti-

nent which might be prejudicial to the national interests, or indicate an imminent air attack against vital targets in the United States and Canada, and to restrict violations of sovereign airspace." *Tiffany*, 931 F.2d at 273 (citations and internal quotation marks omitted).

RAD a strata of tort law which would be both capricious and confining in its impact.

*Tiffany,* 931 F.2d at 279 (internal citations and quotation marks omitted).

On the other hand, in a case where the court would not be required to evaluate a military decision, but rather is faced with an ordinary tort suit, the political question doctrine does not bar judicial consideration. "[B]ecause the common law of tort provides clear and well-settled rules on which the district court can easily rely, this [type of] case does not require the court to render a decision in the absence of 'judicially discoverable and manageable standards.'" *Norwood v. Raytheon Co.,* 455 F.Supp.2d 597, 604–05 (W.D.Tex.2006) (rejecting plaintiffs' argument that radar systems acquired during the Cold War and used by United States military were defectively designed and manufactured implicated the second *Baker* factor) (quoting *Klinghoffer v. S.N.C. Achille Lauro Ed Altri–Gestione Motonave Achille Lauro in Amministrazione Straordinaria,* 937 F.2d 44, 49 (2d Cir.1991)); *see also Getz v. Boeing Co.,* No. CV 07–6396 CW, 2008 WL 2705099, at *1–4, 8–9 (N.D.Cal. July 8, 2008) ("no indication of decision-making particular to the military" implicated in suit against Honeywell International and Boeing Co. alleging defective design and production of Army helicopter that crashed in Afghanistan).

In this case, the Defendants argue that a determination of the merits of this action would require the Court to decide the correct procedures for responding to a rocket attack or whether the Army should have launched the Apaches despite alleged reports of communications problems or inadequate crew rest. However, there is no evidence, at least at this point, to suggest that this suit will in fact implicate these questions. Indeed, the complaint specifically alleges that the Defendants "failed to adequately warn the United States Army of the unreasonably dangerous nature of the Helicopter" and the helmet. (First Am. Compl. at ¶¶ 29, 32.) Accordingly, the Court is unwilling to find that the second *Baker* factor weighs in favor of the Defendants.

The third factor articulated in *Baker* "requires courts to evaluate whether it would be impossible to decide the case without making an initial policy determination of a kind clearly involving nonjudicial discretion." *In re Agent Orange Prod. Liab. Litig.,* 373 F.Supp.2d 7, 71 (E.D.N.Y. 2005), *aff'd sub nom. Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.,* 517 F.3d 104 (2d Cir.2008). "Under this factor, a political question is implicated if in deciding the case, a court would have to make a policy determination of the kind appropriately reserved for diplomatic—and thus Executive—discretion. A political question under the third factor exists when, to resolve a dispute, the court must make a policy judgment of a legislative nature, rather than resolving the dispute through legal and factual analysis." *Gross v. German Foundation Indus. Initiative,* 456 F.3d 363, 388 (3d Cir.2006) (internal citations and quotation marks omitted). The court's inquiry here focuses on "whether it will impermissibly intrude on the Executive's role in formulating policy." *Id.* at 389. In resolving cases, courts are not to "make initial policy decisions of a kind appropriately reserved for military discretion." *Aktepe,* 105 F.3d at 1404.

It is the position of the Defendants that, to decide the merits of the instant matter, the Court would be required to make initial policy determinations as to whether Apache pilots were sufficiently trained, sufficiently briefed on their mission and rested prior to flight. Again, the Court is not convinced at this juncture that these questions will be at issue in this case.

"The fourth through sixth *Baker* factors appear to be relevant only if judicial resolution of a question would contradict prior decisions taken by a political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests." *Norwood*, 455 F.Supp.2d at 606 (quoting *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995)). Although the Defendants aver that the remaining *Baker* considerations apply to this case, they do so in conclusory fashion, without presenting any case law or evidence supporting their assertions. Furthermore, the Court recognizes it has been held that damage actions, such as the one brought by the Plaintiff, "are particularly judicially manageable" and "nonintrusive." *See Koohi v. United States*, 976 F.2d 1328, 1332 (9th Cir.1992), *cert. denied*, 508 U.S. 960, 113 S.Ct. 2928, 124 L.Ed.2d 679 (1993). Based on the information before it, the Court finds that the Plaintiff's claims are justiciable.[45] The Court's analysis does not, however, end there.

*"Combatant Activities" Exception.*

▆▆ In the alternative, the Defendants maintain that the Plaintiff's complaint is preempted pursuant to the "combatant activities" exception to the FTCA[6] and, therefore, should be dismissed for failure to state a claim. Generally, federal courts cannot entertain suits against the United States absent its consent. *Koohi*, 976 F.2d at 1332. The United States has consented to be sued under, among other enactments, the FTCA. *Id.* Thus, "the United States has waived its sovereign immunity from state law tort suits 'under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" *McMahon*, 502 F.3d at 1341 (quoting 28 U.S.C. § 1346(b)(1)). The FTCA contains certain explicit exceptions to this waiver of sovereign immunity, including the combatant activities exception. *Id.; see* 28 U.S.C. § 2680(j) (excepting "[a]ny claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war"). The purpose of the exception "is to recognize that during wartime encounters no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action." *Koohi*, 976 F.2d at 1337.

4. In so deciding, the Court notes that "[t]he political question doctrine does not, however, allow courts to avoid deciding cases merely because they have political overtones or questions they might categorize as 'political' and the decision that a question is nonjusticiable is not one courts should make lightly." *McMahon v. Presidential Airways, Inc.*, 460 F.Supp.2d 1315, 1319 (M.D.Fla.2006), *aff'd* 502 F.3d 1331 (11th Cir.2007), *reh'g and reh'g en banc denied*, 255 Fed.Appx. 504 (11th Cir. 2007) (quoting *El–Shifa Pharm. Indus. Co. v. United States*, 378 F.3d 1346, 1362 (Fed.Cir. 2004) and *In re Agent Orange Prod. Liab. Litig.*, 373 F.Supp.2d at 65–69); *see also Smith*, 2006 WL 1342823, at *4 (court expressed reluctance to dismiss case on political question grounds at early stage of litigation); *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 450 F.Supp.2d 1373, 1376 n. 1 (N.D.Ga. 2006) (same).

5. The Court reaches its decision by analyzing the motion to dismiss under Rule 12(b)(1). *See Bredesen*, 500 F.Supp.2d at 762–64 (analyzing issue of whether plaintiff's claim was barred by the political question doctrine pursuant to subsection (1) of Rule 12(b)).

6. The Plaintiffs initially aver in their responsive brief that the FTCA does not apply outside the United States and, therefore, cannot apply here as the crash of the Apache that caused Flanigan's death occurred in Afghanistan. However, the Plaintiff cites to no case law supporting her contention. Indeed, every case cited by the Plaintiff in support of her remaining arguments concerning the combatant activities exception to the FTCA involves deaths in either Iraq or Afghanistan and appear to assume that the FTCA is applicable.

The Defendants' argument for preemption in this case is based on the United States Supreme Court's analysis articulated in *Boyle*, in which it recognized the government contractor defense. David Boyle, a Marine helicopter co-pilot, was killed when his aircraft crashed off the Atlantic coast. His father sued the helicopter manufacturer alleging defective repair and design. *Boyle*, 487 U.S. at 502–03, 108 S.Ct. at 2513. The Supreme Court framed the issue before it thusly: "This case requires us to decide when a contractor providing military equipment to the Federal Government can be held liable under state tort law for injury caused by a design defect." *Id.* at 502, 108 S.Ct. at 2513. "The Court concluded that the 'uniquely federal interest' of 'getting the Government's work done' requires that, under some circumstances, independent contractors be protected from tort liability associated with their performance of government procurement contracts." *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d at 87 (citing *Boyle*, 487 U.S. at 504–05, 108 S.Ct. 2510). "The existence of a uniquely federal interest does not, however, alone justify displacement of state law. There must also exist a significant conflict between the federal interest and the application of state law." *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1153 (6th Cir.1995) (citing *Boyle*, 487 U.S. at 507, 108 S.Ct. at 2516) (internal quotation marks omitted). It was the finding of the Supreme Court in *Boyle* that state tort law was preempted by the United States' "profound interest in procuring complex military equipment." *McMahon*, 460 F.Supp.2d at 1328–29 (citing *Boyle*, 487 U.S. at 504, 507, 108 S.Ct. 2510).

The Defendants also rely on two subsequent cases which applied *Boyle* to preclude actions leveled at private contractors arising out of military encounters during wartime—*Koohi* and *Bentzlin v. Hughes*

*Aircraft Co.*, 833 F.Supp. 1486 (C.D.Cal. 1993).

In *Koohi*, the Ninth Circuit found that an action against a defense contractor brought by heirs of deceased passengers and crew of an Iranian civilian aircraft downed by a United States warship during Iran–Iraq hostilities could not survive, thereby extending the *Boyle* preemption to combatant activities. *Koohi*, 976 F.2d at 1328, 1330, 1336–37. The court reasoned as follows:

> [T]he combatant activities exception would ... shield those who supply a vessel's weapons ... [because] one purpose of the combatant activities exception is to recognize that during wartime encounters no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action. While the purpose of the [defense contractor's system] may have been, in part, to protect the lives of United States servicemen, its purpose surely was not to protect the lives of enemy forces or persons associated with those forces. Neither the United States nor its defense contractors owed any duty to such individuals. Because the Iranian Airbus took off from an Iranian joint commercial-military airport, was flying in the area of a combat zone, and failed to communicate its civilian status to the crew of the [warship], the direction of force against the aircraft by United States naval forces cannot give rise to tort liability. The imposition of such liability on the [defense contractor] would create a duty of care where the combatant activities exception is intended to ensure that none exists.

*Id.* at 1336–37.

In *Bentzlin*, family members of Marines accidentally killed in combat during the Persian Gulf War when their armored vehicle was struck by a missile fired from an

Air Force plane sued the missile manufacturer alleging a defect causing the missile to deviate from its intended target. *Bentzlin,* 833 F.Supp. at 1486–87. The district court, relying heavily on *Koohi,* extended the Ninth Circuit's holding to preempt not only lawsuits by "enemies" of the United States but also actions arising from the deaths of American soldiers in combat based on product liability. *Id.* at 1494. The *Bentzlin* court found the exception applicable not only to alleged design defects but to manufacturing defects as well. *Id.* at 1493–94. In explaining its rationale, the court stated that

> tort law is based in large part on deterrence; tort liability is meant to make tortfeasors more careful.... During wartime, manufacturers ... should not be made overly cautious in the production and transportation of weapons, since delay may lead to missed strategic opportunities and deaths of American soldiers.

> Indeed, the federal interest in obtaining sophisticated military equipment as expeditiously as possible during wartime would be frustrated by allowing manufacturing defect suits against government contractors. The exigencies of war often require high-tech equipment to be delivered to the "front" as quickly as possible. In war, the benefit of producing weapons and transporting them as quickly as possible to arm American soldiers far outweighs the risks of defective workmanship; soldiers' lives may be lost as a result of delays in the delivery of weapons. Exposing government contractors to tort liability, even for manufacturing defects, would place undue pressure on manufacturers to act too cautiously, even when the national interest would be better served by expedient production than defect-free weapons.

> A second purpose of tort law is to punish tortfeasors. In enacting the combatant activities exception, Congress deter-

mined that the government should not be punished for mistakes made during war. This purpose of the exception similarly applies to government contractors, since tort law is not required to punish government contractors. The United States government is in the best position to monitor wrongful activity by contractors, either by terminating their contracts or through criminal prosecution....

> \*        \*        \*

> ... [T]he federal interest in maintaining the military dignity of casualties suffered by soldiers fighting a war on behalf of the United States would be harmed by allowing soldiers killed or injured in war to bring suits against military contractors. Unfortunately, soldiers die and are injured in combat. Casualties are contemplated prior to war and judged to be a necessary consequence of the decision to go to war.... Where a deliberate choice has been made to tolerate tragedy for some higher purpose, civilian state law standards cannot be applied to those who suffer the tragedies contemplated in war.

*Id.* at 1493–94 (internal citations and footnotes omitted).

The court further noted that, to prevail in a suit based on a manufacturing defect, a plaintiff would have to establish that the soldier's death was caused by a manufacturing defect and not by

> ... deliberate decisions by the military to use equipment that may be flawed but gives overall strategic advantage to the United States. During war, the United States Defense Department may authorize the use of equipment that might not be authorized in less urgent times, or it may waive, expressly or impliedly, standard manufacturing procedures. The balancing of interests of fitness of design, quality of manufacture, immediacy

of delivery, and thoroughness of training is essential to the conduct of war. Decisions must be made and compromises accepted in the national interest by the government and its contractors without fear of the consequences of civil liability. Indeed, federal interests would be frustrated if discovery was required to determine whether a malfunction was caused by the United States' wartime policy or a manufacturer's shoddy workmanship.

*Id.* at 1495.

In response, the Plaintiff points out that subsequent courts have declined to follow *Koohi* and *Bentzlin*, citing *McMahon, Carmichael* and *Lessin v. Kellogg, Brown & Root,* No. CIVA H–05–01853, 2006 WL 3940556 (S.D.Tex. June 12, 2006). Each of the cases referred to by the Plaintiff is, however, distinguishable in that none involved alleged manufacturing or design defects. *See McMahon,* 502 F.3d at 1336 (contractor providing air transportation and other support services for United States Army sued after aircraft crashed into a mountain, alleging negligence); *Carmichael,* 450 F.Supp.2d at 1374 (suit brought on behalf of soldier injured in a vehicle accident while serving as a military escort for a truck convoy); *Lessin,* 2006 WL 3940556, at * 1 (negligence action arising from injury to military personnel by equipment malfunction while providing military escort to commercial convoy).

In *McMahon,* the district court suggested that *Koohi* and *Bentzlin* were wrongly decided as the courts therein had either "unwittingly confused the government contractor defense [set forth in *Boyle* ] and the [statutory] combatant activities exception to the FTCA" or "crafted an entirely new defense based on sovereign immunity and federal preemption" for which there was no express authority. *McMahon,* 460 F.Supp.2d at 1330. The court went on to find that, in any case, the combatant activi-

ties exception did not apply to the negligent provision of services case before it, as it "at most . . . only shields private defense contractors for products liability claims involving complex, sophisticated equipment used during times of war." *Id.* at 1330–31.

The soldier injured in the *Carmichael* case was a passenger in a tractor-trailer driven by a civilian employee of defense contractors KBR and Halliburton Energy Services. *Carmichael,* 450 F.Supp.2d at 1374. The plaintiff alleged that the defendants were vicariously liable under the doctrine of *respondeat superior* and directly liable for negligently selecting, training and supervising the truck driver. *Id.* Similarly, the plaintiff in *Lessin,* also a member of the United States Army, attempted to assist the driver of a truck in the convoy he was escorting that had suffered an equipment malfunction when he was struck in the head by the vehicle's ramp assist arm. *Lessin,* 2006 WL 3940556, at *1. He sued the defense contractor for negligence in inspecting, maintaining and repairing the truck and in supervising the driver. *Id.* The *Carmichael* court noted that neither *Koohi* nor *Bentzlin* was binding precedent and questioned whether they "represent[ed] expansions of the holding in *Boyle* that the Supreme Court may or may not have intended." *Carmichael,* 450 F.Supp.2d at 1381. Both courts recognized the "vital distinction" between the types of case before them—where the defendant "provided a convoy service"—and those involved in *Koohi* and *Bentzlin* which concerned "complex equipment acquired by the Government in its procurement process, which inevitably implicates nuanced discretion and sophisticated judgments by military experts." *Id.* at 1380–81 (quoting *Fisher v. Halliburton,* 390 F.Supp.2d 610, 616 (S.D.Tex.2005)); *Lessin,* 2006 WL 3940556, at *4–5 (same).

It is the opinion of this Court that the action at bar falls into the *Koohi/Bentzlin* category of cases, as the systems and components alleged by the Plaintiff to have caused Flanigan's death constitute "complex equipment acquired by the Government in its procurement process." *See id.* Accordingly, the Plaintiff's claims against Defendants Honeywell, MDHC, Boeing and Westar are preempted under the combatant activities exception to the FTCA and are hereby DISMISSED.